No. 24-3340, 24-3177

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MAKUEEYAPEE D. WHITFORD,

*Plaintiff-Appellant*,

v.

JIM SALMONSEN, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Montana
No. 22-70-H-BMM-JTJ
Hon. Brian Morris

---

## PLAINTIFF-APPELLANT'S PRINCIPAL OPENING BRIEF

---

Amaris Montes
Lillian Novak
D Dangaran
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
202-455-4399
amaris@rightsbehindbars.org
*Attorneys for Plaintiff-Appellant*
*Makueeyapee Whitford*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 3

ISSUES PRESENTED ........................................................................ 4

STATEMENT OF THE CASE .............................................................. 4

    I.   Factual History ........................................................................ 4

    II.  Procedural History ................................................................ 13

SUMMARY OF THE ARGUMENT ................................................... 19

STANDARD OF REVIEW ................................................................ 22

ARGUMENT ................................................................................... 22

    I.   Whitford Is Substantially Burdened by MSP's Clear-Conduct Policy .. 23

       A.  Pipe Carrier ....................................................................... 29

       B.  Powwow ............................................................................ 30

       C.  Sweat Setup ...................................................................... 33

    II.  The Court Erred When It Held that Defendants Had a Compelling Interest to Deny Whitford's Religious Practices ............. 40

       A.  Defendants Did Not Provide Sufficient Evidence to Restrict Sweat Setup, Drum Group, or Pipe Carrying ....................... 41

       B.  Defendants' Arguments Regarding the Compelling Interest in Preventing Access to Powwow Rely on Erroneous, Unreliable Evidence ........................ 45

    III.  The District Court Erred in Holding that Defendants' Clear-Conduct Policy is the Least Restrictive Means Necessary to Achieve Their Purported Compelling Interest ....................... 50

       A.  The District Court Erred in Holding that Barring Access to Drum Group Was the Least Restrictive Means ............. 52

       B.  Denying Access to Powwow, Sweat Setup, and Pipe Carrier Was Not the Least Restrictive Means ........................ 55

CONCLUSION .................................................................................. 59

i

# TABLE OF AUTHORITIES

## Cases

*Ackerman v. Washington*, 16 F.4th 170 (6th Cir. 2021) .........................................36

*Ali v. Stephens*, 822 F.3d 776 (5th Cir. 2016) ........................................................55

*Austin v. Brown*, No. 3:18-CV-600-WQH-JLB, 2019 WL 2868925 (S.D. Cal. July 3, 2019) .................................................................................................................39

*Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999) ...........................................22

*Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) ..........................................49

*Canell v. Lightner*, 143 F.3d 1210 (9th Cir. 1998) ................................................28

*Covey v. Hollydale Mobilehome Ests.*, 116 F.3d 830 (9th Cir. 1997) ....................22

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ................................................................1

*Greene v. Solano Cnty Jail*, 513 F.3d 982 (9th Cir. 2008) ............................ passim

*Greenhill v. Clarke,* 944 F.3d 243 (4th Cir. 2019) ........................................ passim

*Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014) ................................................50

*Harry v. Arizona Dep't of Corr.*, No. CV-10-0736, 2014 WL 12687687 (D. Ariz. Mar. 14, 2014) .....................................................................................................29

*Hartmann v. California Dep't of Corrections and Rehabilitation*, 707 F.3d 1114 (9th Cir. 2013) .................................................................................................39

*Holt v. Hobbs*, 574 U.S. 352 (2015) ................................................................ passim

*Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022) ........................................... passim

*Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022) .......................................................24

*Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006) ................................................ 26, 27

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................32

*Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781 (5th Cir. 2012) ..... 27, 49

*Nance v. Miser*, 700 F. App'x 629 (9th Cir. 2017) .......................................... 24, 45

*Nance v. Miser*, No. CV-12-0734-PHX-RCB, 2013 WL 6196289 (D. Ariz. Nov. 27, 2013) ...............................................................................................................40

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100 (9th Cir. 2020) .............................................................33

*Ramirez v. Collier*, 595 U.S. 411 (2022) ............................................ 1, 23, 24, 25

*Rhoden v. Dep't of State Hosps.*, No. 18-CV-00101, 2020 WL 5737019 (E.D. Cal. Mar. 20, 2020) ...................................................................................................28

*Rogers v. Giurbino*, 625 F. App'x 779 (9th Cir. 2015) ..........................................28

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) ...............................................27

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................. 22, 55

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) ........................................... passim

*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010) ................................................22

*United States v. Christie*, 825 F.3d 1048 (9th Cir. 2016) .......................................53

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ................................. passim
*Williams v. Annucci*, 895 F.3d 180 (2d Cir. 2018) .................................................55
*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014)..................................... 38, 49

**Statutes**

28 U.S.C. § 1291 ...........................................................................................4
28 U.S.C. § 1331 ...........................................................................................3
42 U.S.C. § 2000cc *et seq* ............................................................................ passim

**Rules**

Fed. R. App. P. 4(a)(1)(A) ...........................................................................4
Fed. R. Civ. P. 56 ..................................................................................... 30, 55

# INTRODUCTION

Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.*, to provide broad protection for people who are unable to freely attend to their religious needs and are therefore dependent on the government's accommodation to practice their religion. *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). Congress explicitly recognized that "prisoners . . . have a strong interest in avoiding substantial burdens on their religious exercise, even while confined," making clear that denial of religious liberties shall not be an additional punishment imposed on incarcerated people. *Ramirez v. Collier*, 595 U.S. 411, 433 (2022).

Plaintiff-Appellant Makueeyapee Whitford is an enrolled member of the Blackfeet Nation and a devout practitioner of Native religious practices that his people have practiced since time immemorial. Montana State Prison (MSP) violated Whitford's rights under RLUIPA when MSP barred Native religious practices such as powwow, sweat lodge setup, drumming practice, and eligibility as a pipe carrier by requiring Whitford to be six months free of disciplinary infractions to practice—referred to herein as the "clear-conduct policy." In effect, MSP used its clear-conduct policy as a form of punishment to withhold these religious practices. In doing so, MSP treated Whitford's religious exercise as a privilege instead of a right, contradicting RLUIPA's intent. This burden was substantial: in the nearly ten years

he has been incarcerated in MSP, Whitford has never been able to exercise these religious practices. These collective forms of worship are critical to Native religious practice. For a Native person to not attend powwow for ten years is like barring a devout Christian from attending Christmas holiday celebrations every year for ten years or denying a Muslim's ability to practice Ramadan for a decade.

The district court failed to recognize these burdens on Whitford's religious practice, granting summary judgment in favor of Defendants for nearly all claims, despite their utter lack of evidence to show a compelling interest or to grapple with any alternatives Whitford presented. The district court's errors show that at its core, the district court incorrectly treated Whitford's religious practices as optional privileges that can be stripped because of security classifications. The district court held that because Whitford could access some other religious practices—such as participating in pipe ceremony, talking circles, or the sweat lodge—Whitford's requested practices were not necessary.

But RLUIPA bars this kind of negotiation. It is irrelevant whether someone can practice their religion in other forms. The inquiry must be narrowly focused on each and every specific religious deprivation alleged. Comparing to another faith may help show RLUIPA's logic: holding that Whitford is able to attend sweat lodge and pipe ceremony, but not powwows, sweat lodge setup, drumming, or being a pipe carrier, is akin to holding there is no RLUIPA violation if a Catholic prisoner was

able to attend mass on Easter and Christmas, but not on Ash Wednesday or Good Friday, and was prohibited from taking communion or singing with the church choir. This cannot be the case. Congress has determined that even prisoners in high-security settings or who commit disciplinary violations have sacrosanct religious rights; RLUIPA's broad protections do not allow for a blanket security exception.

The district court committed many foundational errors that the Supreme Court and this Circuit have explicitly corrected in previous cases. The district court deferred to Defendants' blanket security justifications as their compelling interest though Defendants did not produce detailed evidence of those security interests or the resources required to allow Whitford access to these ceremonies. The court also explicitly recognized that Defendants did not grapple with any alternatives to limiting Whitford's religious practice, including any of those provided by Whitford, yet held in Defendants' favor. This is especially troubling because Whitford presented evidence that the Washington State Department of Corrections (WDOC) provided access to all the religious rights Whitford requests without any clear-conduct requirement, suggesting that there are less restrictive means available to reach Defendants' security interest. These errors require reversal.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction. 28 U.S.C. § 1331. Whitford's notice of appeal was docketed May 17, 2024. 3-ER-531. Whitford

3

therefore timely appealed the district court's final judgment entered April 10, 2024. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court erred in holding that there was no substantial burden on Whitford's religious exercise, even though he has been prohibited from performing many Native religious practices for nearly ten years.

2. Whether the district court erred in deferring to Defendants generalized assertions about their purported compelling interests in security and resource allocation, when Defendants presented no specific evidence tailored to each religious practice and did not quantify their compelling interests.

3. Whether the district court erred in the least-restrictive means assessment by granting summary judgment for Defendants when Defendants did not provide any evidence that they considered alternatives, including those offered by Whitford.

## STATEMENT OF THE CASE

### I.    Factual History

Makueeyapee Whitford is an enrolled member of the Blackfeet Nation and is incarcerated on the high-side at MSP. 1-ER-3. Whitford follows religious practices specific to his Blackfeet traditions and participates in intertribal traditional ceremonies and practices of other Native people and Nations. 2-ER-76–77; 2-ER-

145–46. Whitford's Native religious practices include sweat lodge setup, celebration of the powwow ceremony, performing as a drummer, and acting as a pipe carrier. 2-ER-76–77; 2-ER-152.

Under MSP's clear-conduct policy, MSP requires religious observants to be six months free of disciplinary infractions to participate in these four religious practices. *See* 3-ER-340–49. MSP also bans certain religious practices, such as carrying a personal pipe, which is part of Whitford's religious practice. 2-ER-42; 3-ER-488.

Whitford is a vocal advocate for his and other prisoners' rights. 2-ER-78; 3-ER-469. He alleged that he receives many disciplinary infractions in retaliation for his advocacy, and he often is not provided with adequate due process to dispute those infractions. 2-ER-78, 2-ER-152; 2-ER-186; 3-ER-469; 3-ER-500.[1] Because of his disciplinary tickets, MSP's clear-conduct policy entirely prevents Whitford from participating in sweat lodge setup, being eligible to be a pipe carrier, participating in the drum practice group, and celebrating a powwow ceremony, all of which are essential to his religious practice. 2-ER-77–78; 3-ER-463.

## A. Whitford's Sincerely Held Beliefs Require Him to Act as a Piper Carrier

---

[1] Whitford alleged claims in this current action based on violations of the Due Process Clause in his original complaint, which are not on appeal here. Dist. Ct. Doc. 2.

5

**and Engage in Powwows, Sweat Setup, and Drumming.**

Native religious practices have deep personal significance to Whitford. Acting as a piper carrier and engaging in powwows, sweat setup, and drumming are "all important aspects of [his] religion as an American Indian and member of the Blackfeet Nation." 2-ER-152.

Whitford acted in the honorable role of pipe carrier for his people prior to being incarcerated. 2-ER-151. He describes that he was "taught that the person who holds a sacred medicine pipe . . . transfers all of his energy into the activity of holding that pipe, blessing it, and controlling it." 3-ER-515. He also knows the prayers and ceremonies performed when harvesting the plants used in the pipe ceremony, as well as the process for choosing the pipe carrier. *Id.*

Whitford testified about the significance of powwows for him and his people. He testified that "powwow . . . is a very important activity that brings people together," a "spiritual gathering, and a "time of spiritual rejoice and unity." 3-ER-418. Powwows happen on an annual basis. 3-ER-516. Whitford has deep knowledge of the importance and history of the powwow and its dances. *See id.* (recounting the history of Grass Dance and Sun Dance and describing the evolution of powwow after these dances were outlawed).

Setting up for the sweat ceremony is also religiously significant for Whitford. The sweat setup is integral to the spiritual significance of the ceremony as a whole;

setup activities are "actually part of the sweat ceremony" because the ceremony begins "at the preparation stage, not when everyone is ready to sweat." 2-ER-80. And "[t]he sweat setup portion of the ceremony involves ceremonial preparation which specifically charge the ceremony prior to the main event of the ceremony." *Id.*

Whitford also believes that the drum holds "almost . . . equal power" to the pipe," noting that it "is often said that 'if the drum beat dies, the American Indian people will also die.'" 2-ER-148. Drums are used at both powwows and sweat ceremonies. 2-ER-153–54. The sweat ceremony has distinct songs from powwow songs and the two are not interchangeable. 2-ER-81.

## B. MSP's Policies Prevent Whitford from Exercising Native Religious Practices

Whitford has been incarcerated at MSP for nearly ten years. 2-ER-148. He was previously incarcerated in WDOC for ten years. *Id.*

General population housing in MSP is divided into the low-side, where there are fewer restrictions and more privileges, and the high-side of the prison, where there are additional security measures. 3-ER-335. Incarcerated people on the high-side are not permitted on the low-side for any reason. *Id.* Both high-side and low-side populations are allowed to access out-of-cell religious activities. 3-ER-320. General population units, including the high-side, are separate from maximum-custody housing in MSP, where out-of-cell activities are not provided at all. *Id*. Since

7

August 2023, Whitford has been housed in general population on the high-side. 3-ER-327.

MSP has a detailed disciplinary policy. 2-ER-202–22. Under this policy, "[g]enerally," restricting an incarcerated person from participating in a certain activity may only be used as a form of discipline "when the violation involves that activity or the rules regulating it." 2-ER-227.

Many religious activities at MSP are governed by the Religious Activities Center ("RAC") Inmate Rules. 3-ER-446–47. MSP has specific Native American Religious Programming Guidelines, which include the criteria for participation in the pipe and sweat ceremonies, the selection of the pipe carrier and the sweat lodge setup crew, and operation of the sweat lodge, pipe ceremonies, drum group practice. 3-ER-340–49; 3-ER-451–60.

MSP institutes many security measures for all Native religious practices, including the practices at issue. Each incarcerated person who wishes to attend ceremonies have their identification credentials photocopied and their information is entered in a logbook. *Id*. Moreover, staff perform scheduled inmate counts throughout the ceremonies, randomly pat-search prisoners entering or exiting the RAC, and perform unclothed body searches. *Id*. MSP staff thoroughly inspect the ceremonial areas when activities have concluded. 3-ER-345.

### i. Pipe Carrier

MSP regularly holds pipe ceremonies, both within sweat lodge and separately. 3-ER-322. Two incarcerated people per side are elected by their respective Native American congregation to carry the sacred pipe. 3-ER-321. These pipe carriers are responsible for preparing the smoking mixture and the pipe for the ceremony. 3-ER-321–22. Pipe carriers are "selected by a process as determined by the MSP." 3-ER-343. MSP requires carriers to meet the clear-conduct policy. 2-ER-80. The policy does not apply to participating in the pipe ceremony. 3-ER-322.

MSP has various security protections concerning pipe carriers and pipe ceremony. Each sacred pipe is kept in a secure storage unit under direct supervision of a staff member. 3-ER-343. RAC staff meet with a pipe carrier in a designated location to prepare the approved pipe mixture. *Id.* RAC staff are responsible for closely monitoring and completing inventory of tobacco used for pipe ceremonies. 3-ER-344. At the end of each pipe ceremony, the pipe and related items are inspected by staff, and any incarcerated person who inappropriately utilizes or obtains pipe mixture receives a major disciplinary infraction. *Id.*

Whitford has never been eligible to be elected as a pipe carrier—despite his deep knowledge and experience as a pipe carrier previously—because of the clear-conduct policy. 2-ER-151.

### ii. Powwows

At MSP, powwows are considered an "other" type of special activity, which incarcerated people must petition for. 3-ER-335. Those interested in participating must meet the clear-conduct policy. 3-ER-324. Security safeguards are implemented at special activities. For example, guests and participants are subject to pat searches before and during the event. 3-ER-353.

Native American individuals on the low-side petitioned to hold a powwow as a special activity in December 2023. 3-ER-323. The last powwow in any unit in the prison occurred in 2019. *Id.*

Whitford has never been able to attend or even witness a powwow while incarcerated at MSP. 2-ER-150. Because of the clear-conduct policy, Whitford cannot petition to hold a powwow on the high-side. 2-ER-150; 3-ER-471. Because no prisoner on the high-side is permitted to go to the low-side, Whitford would not be able to attend a powwow on the low-side even if he met the clear-conduct policy. 3-ER-335–36. Additionally, there are never enough people on the high-side who are infraction free in order to petition for a powwow. 3-ER-480.[2] Whitford previously requested to hold a powwow but was denied. 1-ER-12.

---

[2] Whitford describes that when he attended pipe ceremony on October 3, 2023, and asked everyone in attendance exactly how many individuals had clear conduct for six months, only two of about twenty people raised their hands. 3-ER-480; 3-ER-522.

### iii. Sweat Lodge Setup

Sweat ceremonies are held at separate times for low-side and high-side units at MSP but are held in the same location in the RAC. 3-ER-320. MSP divides the sweat lodge ceremony into two parts: setup and ceremony. 3-ER-342. Each setup crew consists of four incarcerated people plus two alternates. 3-ER-321; 3-ER-342. Incarcerated people must apply to be part of the setup crew and must meet the clear-conduct policy to be eligible. 3-ER-321; 3-ER-342. The policy does not apply to attending the sweat lodge ceremony. *Id.*

MSP has security measures to ensure safety during the setup and the sweat lodge ceremony. RAC staff accompany and directly supervise the setup crew at all times. 3-ER-342. Staff log the incarcerated people involved in setup, their arrival and departure times, as well as any incident that is out of the ordinary. *Id.* During the setup and ceremony, staff are always on site "to provide security functions . . . [and] to ensure inmates are in compliance with the sweat protocol." 3-ER-343.

Whitford has never been able to participate in the setup for sweat lodge ceremony because of MSP's clear-conduct policy, despite his sincere belief that it is an integral part of his religious practice. Whitford believes MSP unnecessarily and inappropriately divides sweat setup and sweat lodge ceremony, when, per his religion, they are two pieces of a whole. 2-ER-80; 3-ER-471; 3-ER-495.

### iv. Drum Practice Group

MSP has a drum group which provides drumming for sweat ceremonies and for any potential powwow ceremonies. 3-ER-323. This drum group practices before ceremonies and is the only place to practice powwow drumming, which is distinct from sweat songs. *Id.* According to MSP policy, the drum practice group is not considered a religious activity but is considered an "auxiliary group." 3-ER-329. However, incarcerated people may smudge at the beginning of the practice session, which is a religious practice. *Id.* Drum practice group members must meet the clear-conduct policy. 3-ER-323.

Whitford has never been able to participate in drum practice group at MSP. 2-ER-63. According to MSP records, only three incarcerated people in the high-side have attended drum group since 2017, even though there is capacity for sixteen participants. 3-ER-328; 3-ER-349. The only time when Whitford can drum is during sweat lodge ceremonies. 2-ER-345. But, practically, because "there is not enough time to work the drum and to have sweat at the same time," he is foreclosed from drumming. 2-ER-153–54. Drumming powwow songs, a separate religious practice from sweat lodge drumming, is impossible in this forum because "attempting to sing powwow songs in addition to the sweat ceremony, at the same time, would be a disruption to the sweat ceremony . . . ." *Id.*

Whitford filed many grievances with officials at MSP regarding the clear-conduct policy's impact on all of these religious activities. 2-ER-189–200. In his

grievances, he reiterated the religious significance of these ceremonies, explained his inability to practice because of the clear-conduct policy, and requested the prison provide justification beyond a blanket invocation of security. 2-ER-190–93. MSP summarily responded that their decision to retain the six-month rule was based on security concerns. 2-ER-197–200.

## II. Procedural History

Whitford filed the current action *pro se* alleging, *inter alia*, that MSP violated his religious rights under RLUIPA when their clear-conduct policy prevented him from participating in powwow, sweat setup crew, and drum practice group, being eligible to be pipe carrier, or using a personal pipe for general religious practice. 2-ER-37–59. Whitford filed a timely motion for summary judgment 2-ER-60–75. Defendants also filed for summary judgment. 2-ER-233–63.

In support of their motion for summary judgment, Defendants included three affidavits by MSP officials. The Religious Activities Coordinator, Terrie Stefalo, wrote two affidavits explaining the security concerns underlying the clear-conduct policy. 3-ER-318–29. She explained that "[i]nmates often use the RAC facilities to pass contraband and unauthorized communications among themselves. . . . The six months' clear conduct requirements help fulfill . . . important security functions by restricting some religious functions to inmates who have demonstrated their trustworthiness by keeping clear conduct." 3-ER-328. She attached reports of

incidents that occurred in the RAC in conjunction with Native American religious programs. Notably, there have been no disciplinary issues in any Native American religious ceremonies for the past five years, and none involved Whitford. *Id.*

Billie Reich, DOC Grievance Manager, provided the only other affidavit to support Defendants' motion for summary judgment. He explains that the MSP's clear-conduct policy is in "place to prevent inmates who have recently exhibited dubious behavior from attending an event. The restriction was put into place after inmates were assaulted, contraband was trafficked, sexual assaults occurred, and gang members planned and conducted fights and assaults." 3-ER-335–36. His declaration cited no incident reports or other evidence of these disciplinary issues occurring. *Id.*

Officer Reich's affidavit addressed only attending a powwow on the low-side, not Whitford's ability to hold powwow on the high-side. 3-ER-335–37. He contended that allowing people housed on the high-side to attend low-side events would require too much staff supervision, taxing the extant high-side staff. 3-ER-336–37. Reich also explained that transfer from the low-side to the high-side is often used to separate certain people from other incarcerated people at MSP with whom they have conflict, which "would need to be considered." *Id*. Reich did not attach any financial and security data demonstrating the extent of the limitations and burdens he invoked.

14

Whitford objected to Defendants' purported security interests. He identified the arbitrary enforcement of these concerns, pointing out that MSP policy prohibits him from participating in some religious practices on security grounds while permitting participation in other practices that occur "at the same place, at the same time, and involve[] the same people." 2-ER-152–53. Additionally, he argued that Defendants already have numerous security measures to ensure the safety of religious activity, and that Defendants do not explain why the clear-conduct policy is necessary, especially when MSP's policies generally only restrict activities when the violation involves the activity. 3-ER-462; 3-ER-492. Further, Whitford pinpoints that there is no equivalent clear-conduct policy "to participate in regular visiting room activities," which pose similar risks as special activities. 2-ER-154. He argued that the clear-conduct policy functions as an incentive program that makes religious exercise a privilege instead of a right. 3-ER-477–78; 3-ER-490.

Whitford provided his experience while incarcerated in WDOC to show that less restrictive means are possible to reach Defendants' purported security interests. Whitford recounted that he served ten years in WDOC, where he could participate in drumming, powwow, and sweat lodge setup, and could be elected pipe carrier. 2-ER-148. He explained that in WDOC, annual powwows "are allowed," "visitors dress[] in full regalia," incarcerated people make gifts to give to loved ones, and all participants feast of traditional Native foods. 2-ER-148–49. These annual powwows

15

are "made available to all general population inmates of all custody levels (including closed custody level[s]) other than Maximum Custody." *Id.* These powwows are supported by a year-round Culture Class where incarcerated people create dance outfits for themselves or their relatives, create gifts to give away, and practice dancing, signing, and drumming. 2-ER-149. Ceremonies include quarterly sweat days and pipe days and change of seasons ceremonies with seven days of sweat activities. 2-ER-149. There, incarcerated people "are able to have the proper amount of time to attend to the sweat activities and those activities are not separated based on sweat setup crew vs. the rest of ceremonial participants." *Id.*

Whitford stressed, "none of these activities are prohibited in any way, shape or form. All inmates are able to attend unless they specifically violate the principals [*sic*] and rules of that specific religious activity or the rules regulating those activities. However, this rarely occurs because of the religious nature of the activities. It does not matter whether or not an inmate has an infraction history or was infracted within the last 6 months." 2-ER-149–50.

Considering these materials, the district court granted summary judgment for Defendants on all claims except Whitford's claim regarding the possession of a personal pipe, for which the court denied summary judgment. 1-ER-22.

The district court dispensed with Whitford's claims regarding his ability to be elected pipe carrier, attend powwow, and participate in sweat setup at the

16

"substantial burden" step of the RLUIPA analysis. The court held that there was no substantial burden on Whitford's ability to be eligible as a pipe carrier because there was no policy that imposed a six-month disciplinary-based restriction on this practice, even though both parties agreed that in practice this restriction exists. 1-ER-11–12. The court held there was no substantial burden on Whitford's powwow access because there was currently no high-side powwow scheduled. *Id.* And the court held that the clear-conduct policy was not a substantial burden on Whitford's ability to be part of sweat setup for two reasons. First, the court reasoned that Whitford had access to other group activities such as talking circle, pipe ceremony, and sweat lodge, and for his other requested religious practices, "the thing stopping Whitford from doing everything he wants to do (other than possess a personal pipe) is his unwillingness to follow the general rules of the prison." 1-ER-15. The court continued that "[a]t worst, Whitford's choices result in a delay in participating in certain aspects of his religion." 1-ER-16. Second, the court reasoned that because setup crew is not available to all incarcerated people, it is a responsibility of only a few, there is no substantial burden. *Id.*

The court agreed that Whitford was substantially burdened by Defendants barring access to his use of a personal pipe or his participation in the drum practice group. 1-ER-12, 17. But the court rejected Whitford's drum group claim on the

17

second two prongs of the RLUIPA analysis—compelling interest and least restrictive means. 1-ER-18.

Turning to compelling interest, the district court held that MSP had a compelling interest in security. Considering the three affidavits provided by the Defendants alone, the court held that Defendants provided sufficient bases for their compelling interests because "Defendants maintain that a six-month clear conduct rule assures that participants have 'demonstrated their trustworthiness.'" *Id.* The court applied the compelling interest Defendants provided for powwow—"to prevent inmates who have recently exhibited dubious behavior from attending"—to the drum practice group, even though the two practices are distinct. 1-ER-18–19. Though Whitford contested the validity of the compelling interests because other religious activities are held in the RAC, the court did not analyze further and deferred to the Defendants' blanket assertion that "activities at the RAC are occasions for misconduct." *Id.*

Finally, the court held that denying individuals the ability to participate in drum practice group was the least restrictive means of addressing MSP's security concerns, all while recognizing "Defendants do not explicitly state that they have considered other approaches." 1-ER-20. Without citing to any evidence provided by Defendants, the court reasoned that Defendants' "discussion of the various issues of contraband and violence related to group activities, and their imposition of a six-

month conduct policy as a result, prove sufficient to demonstrate that this restriction on drum practice passes muster." *Id.*

The court held, however, that Defendants did not provide a sufficient basis for it to hold that denial of a personal pipe was the least restrictive means of achieving their interests. 1-ER-21. The court relied on Whitford's experience in WDOC, where incarcerated people may use personal pipes in a controlled, outdoor manner. *Id.* The court cited Ninth Circuit precedent including *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008), where this Court held that "comparisons with other institutions is useful when considering whether the government is employing the least restrictive means." 1-ER-20. The court directed the parties to brief the narrow issue of the proper scope of relief regarding the personal pipe at MSP. 1-ER-23.

After supplemental briefing, Dist. Ct. Doc. 77, 80, 81, the court ordered Defendants to allow Native people to possess personal pipes for religious purposes and to provide a secure area in MSP where individuals may access the pipes for ceremonial and individual use. 1-ER-33–34.

Whitford filed a timely notice of appeal. 3-ER-531. Defendants cross-appealed. Dist. Ct. Doc. 87.

## SUMMARY OF THE ARGUMENT

While the district court committed many discrete errors in its analysis, this case boils down to a major, yet simple, overarching error: the district court treated

Whitford's Native religious practices as a privilege that could be barred because of disciplinary issues, instead of a fundamental right. Precedent in the Supreme Court, this Circuit, and sister circuits are clear that prisons may not simply halt religious practices when individuals commit disciplinary infractions, even in cases where prisoners are held in disciplinary segregation or on death row. There should be no question that Whitford's religious exercise was substantially burdened, and it was an error for the court to hold that it was not.

Similarly, the court committed a critical mistake in holding that the Native religious practices such as sweat setup or pipe carrying were not substantially burdened because Whitford was able to engage in other religious practices. This directly contradicts the long Supreme Court and Ninth Circuit precedent which has established that RLUIPA requires a specific analysis for each religious exercise in question and prohibits inquiring whether the plaintiff is able to engage in other forms of religious practice.

Next, the district court erred in finding Defendants have stated a compelling government interest. Despite this clear burden on Whitford's religious exercise, the court impermissibly deferred to Defendants' blanket security concerns, which were contradictory and unsupported by any evidence. Defendants only provide general security justifications about passing contraband or unauthorized communications; they failed to include additional information regarding the security concerns for each

religious practice. Because the Supreme Court requires a tailored analysis to each religious practice, Defendants' failure to provide detailed evidence of their compelling interest makes summary judgment improper.

Further, Defendants created an incentive program by providing certain Native religious programs only to those who demonstrate "trustworthiness," withholding access to those who exhibit what they deem "dubious behavior." Courts are clear that such incentive programs are not a permissible compelling interest. The court recognized this principle, but erred in holding that Whitford's case was distinct because his religious activities are limited to a small group of people—a distinction that courts have never made and one that would violate the core tenets of RLUIPA. Defendants' scant evidence, which was limited only to Whitford's ability to hold a powwow, was deficient; Defendants did not quantify the costs that it would require to ensure Whitford could attend powwow on the low-side or host it on the high-side.

Finally, the court erred in its least-restrictive-means inquiry by granting summary judgment to Defendants even after recognizing that "they do not explicitly state that they have considered other approaches." 1-ER-20. Defendants failed to meet RLUIPA's exceptionally high burden to show that they actually considered and rejected less restrictive means. This failure is obvious given Whitford presented a series of exemplary alternatives from his time in WDOC to show that other facilities have allowed these same religious practices without requiring six-months' clear

conduct, while still meeting their security needs. Though the district court recognized Defendants' failure to consider WDOC policy in the pipe carrying context, it failed to apply this same reasoning to the rest of his religious practices. This inconsistent analysis by the court was error, warranting reversal.

## STANDARD OF REVIEW

For a party to prevail on summary judgment where it would bear the burden of proof at trial, that party must provide supporting evidence "so powerful that no reasonable jury would be free to disbelieve it." *Shakur*, 514 F.3d at 890 (internal quotation marks omitted). This Court reviews the grant of summary judgment orders *de novo*. *See Covey v. Hollydale Mobilehome Ests.*, 116 F.3d 830, 834 (9th Cir. 1997). In assessing such orders, the Court's task is to determine "whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999). Facts are reviewed, and reasonable inferences are drawn, in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court liberally construes filings and motions submitted by *pro se* prisoners. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

## ARGUMENT

Under RLUIPA, government entities may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . .

even if the burden results from a rule of general applicability unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

To establish a RLUIPA claim, a plaintiff bears the initial burden of proving that there is a substantial burden on his religious exercise. *Ramirez v. Collier*, 595 U.S. 411, 425 (2022). Notably, "any exercise of religion, whether or not compelled by or central to a system of religious beliefs," falls within the statute's protection. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (citing 42 U.S.C. § 2000cc-5(7)(A)). "Once a plaintiff makes [a showing on substantial burden], the burden flips and the government must demonstrate that imposition of the burden on that person is the least restrictive means of furthering a compelling governmental interest." *Id*. (citations omitted). Cases brought pursuant to RLUIPA require a fact-specific inquiry that considers the special circumstances of the individual prisoner and prison. *Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005). RLUIPA demands that claims "shall be construed in favor of a broad protection of religious exercise." *Holt*, 574 U.S. at 358; *see also Warsoldier*, 418 F.3d at 995.

## I.     Whitford Is Substantially Burdened by MSP's Clear-Conduct Policy

"A substantial burden exists when the state places substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v. Slade*, 23 F.4th

1124, 1142 (9th Cir. 2022) (internal quotations and citations omitted). This Court has rejected a narrow view of the substantial burden requirement. *Johnson v. Baker*, 23 F.4th 1209, 1215 (9th Cir. 2022). The Ninth Circuit has recognized that actions short of an outright ban can violate RLUIPA: "[f]or example, [the Court has] recognized that government action that threatens punishment [] to coerce a religious adherent to forgo her or his religious beliefs, or causes substantial delay, uncertainty, and expense to worship," may amount to a substantial burden. *Johnson*, 23 F.4th at 1215–16 (quotations omitted); *see also Nance v. Miser*, 700 F. App'x 629, 631–32 (9th Cir. 2017) (quoting *Warsoldier*, 418 F.3d at 996).

The district court erred when it held that the clear-conduct policy did not substantially burden Whitford's ability to participate in pipe carrying, sweat setup crew, and powwow. These practices are cornerstones of Whitford's faith. 2-ER-152. An outright ban on specific religious practices is a substantial burden on prisoners' religious rights. *See Ramirez*, 595 U.S. at 424–29. The clear-conduct policy, for the time it is in effect, acts as a complete ban on the religious rights of anyone with a disciplinary infraction. The policy is triggered by *any* disciplinary infraction, no matter how small, and bans access to all of the practices raised in this appeal for half a year, restarting if any disciplinary infraction is obtained within those six months. *See* 2-ER-222; 3-ER-477 (including disciplinary infractions for unexcused absence from work or school, insolence, participating in unauthorized meetings, and taking

24

items from food service). And because of the frequency with which Whitford receives infractions (in part based on his prisoner advocacy), he has not been able to be a pipe carrier or to attend sweat lodge setup, powwow, or drum group for *nearly ten years*. 2-ER-77. Each time Whitford was prevented from engaging in these religious practices, he was forced to act contrary to his religious beliefs, in violation of RLUIPA.

The clear-conduct policy also prevents Whitford from engaging in group worship—a requirement for Native practices— since the burden is so stark on high-side prisoners. Whitford identified that only two of twenty other Native people at one point in time met the clear-conduct policy, and only three people in seven years have attended drum group. 3-ER-480; 3-ER-328; 3-ER-522. This makes meaningful group worship impossible.

The district court incorrectly concluded that Whitford's religious exercise was not substantially burdened by impermissibly shifting its focus from MSP's policy to Whitford's disciplinary history, holding that Whitford would be able to practice his faith if only he would "follow the rules." But the law of the Supreme Court, this Circuit, and sister circuits is clear that incarcerated people do not forfeit their religious rights once they commit disciplinary infractions or are transferred to higher security facilities. *See, e.g.*, *Ramirez*, 595 U.S. at 424–29 (holding that banning

audible prayer on death row substantially burdened the religious practice of a death row prisoner, arguably the highest security setting found in the prison system).

This Circuit has affirmed the need to broadly protect religious practices, even for those with disciplinary infractions or in high-security prisons. In *Greene v. Solano County Jail*, the plaintiff, who faced terrorist charges and was held in a maximum-security area for three months, was denied the ability to attend group religious services. 513 F.3d 982, 985 (9th Cir. 2008). The Ninth Circuit held this denial was a substantial burden on his belief that he was required to attend group services with others, and reversed summary judgment because it amounted to an outright ban on religious exercise for those three months. *Id.* at 987. This Court had "little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Id.*

Sister Circuits across the country agree. In *Lovelace v. Lee*, the Fourth Circuit held that a policy excluding an incarcerated person from special Ramadan meals and daily group prayers when he obtained a disciplinary infraction constituted a substantial burden on his religious exercise. 472 F.3d 174 (4th Cir. 2006). The *Lovelace* court held that when a broad disciplinary policy essentially bars an individual from participating in multiple religious practices, it imposes a significant burden on religious exercise. *Id.* at 188–89. The court was clear that "it makes no difference to this analysis that the burden on [the plaintiff's] religious exercise

26

resulted from discipline (punishment for his alleged infraction), rather than from the prison's failure to accommodate his religious needs in the first instance." *Id.* at 188; *see also Greenhill v. Clarke,* 944 F.3d 243, 246 (4th Cir. 2019) (holding that refusing access to televised Ju'mah services for a prisoner with repeated disciplinary infractions placed in disciplinary segregation was a substantial burden, because religion is not a privilege but a right); *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 787 (5th Cir. 2012), *as corrected* (Feb. 20, 2013) (holding that denying a prisoner kosher meals free of charge, even though his own disciplinary violations caused him to be moved to a unit where the meal was only offered for purchase in commissary, was a substantial burden); *Salahuddin v. Goord*, 467 F.3d 263, 275–79 (2d Cir. 2006) (holding that it was a substantial burden to deny Islamic holiday meals even though the plaintiff was in disciplinary segregation for threatening another prisoner). Thus, this Circuit and sister circuits are clear that Whitford's disciplinary history should have no effect on the religious rights that are afforded him under RLUIPA.

Additionally, the district court incorrectly held that that the clear-conduct policy is not a substantial burden because "Whitford's choices result in a delay in participating in certain aspects of his religion" and a "short term intrusion does not amount to a substantial burden."1-ER-16. Even framed as a case of delay, the clear-conduct policy is a substantial burden. The district court itself recognized that the

Ninth Circuit has held that delay may be one way to establish a substantial burden. *See* 1-ER-10 ("[W]e have recognized that government action that . . . causes 'substantial delay, uncertainty, and expense' to worship, may amount to a substantial burden." (quoting *Johnson*, 23 F.4th at 1215–16)). In holding that the clear-conduct policy created only a short-term delay, the district court misapplied *Canell v. Lightner*, an inapposite case from the First Amendment context, which require a higher burden on the plaintiff than RLUIPA does. 143 F.3d 1210, 1215 (9th Cir. 1998). Notably, the "delay" in *Canell* was a matter of minutes, which cannot be compared to the six month "delay" here (which, in reality, has resulted in a bar of ten years). *See id.*

Indeed, this Court has been clear that even a delay or bar of a religious exercise for six months or fewer is a substantial burden. *See Greene*, 513 F.3d at 985 (holding that a denial of Ju'mah services for three months was a substantial burden); *Rogers v. Giurbino*, 625 F. App'x 779, 783 (9th Cir. 2015) (affirming district court's conclusion that Protestant prisoner's religious practice was substantially burdened by ten-day lock-in during which he was unable to attend Sunday services and group bible study); *Rhoden v. Dep't of State Hosps.*, No. 18-CV-00101, 2020 WL 5737019, at *13 (E.D. Cal. Mar. 20, 2020), report and recommendation adopted, No. 18-CV-00101, 2020 WL 4048489 (E.D. Cal. July 20, 2020) (holding that Catholic state hospital patient's religious practice was substantially burdened when the hospital

"temporarily restricted . . . access to the chapel for approximately three weeks"); *Harry v. Arizona Dep't of Corr.*, No. CV-10-0736, 2014 WL 12687687, at *6 (D. Ariz. Mar. 14, 2014) (holding that confiscating a Quran and not returning it for six weeks was substantial burden). Thus, Whitford has sufficiently alleged that his religious practice was substantially burdened, whether the burden is framed as a delay or a complete bar.

In addition to these overarching errors, the district court made various discrete errors in its analysis regarding the substantial burden on Whitford's specific religious rights including his ability to be a pipe carrier, attend powwow, and be part of sweat setup crew.

## A. Pipe Carrier

First, the court mischaracterized a fact not disputed by the parties when it held that Whitford's eligibility to be pipe carrier was not substantially burdened by the clear-conduct policy. Reasoning that "the policy that allegedly prevents Whitford from being the pipe carrier does not mention a six-month restriction," the district court concluded that no burden existed, without inquiring as to whether a burden existed in practice. 1-ER-11.[3] This conclusion is particularly lacking because, as the

---

[3] The policies cited by the court alludes to a disciplinary restriction on pipe carriers. Indeed, the court acknowledges that, according to the Guidelines, the community pipe carrier remains until "they resign, leave the facility, are moved out of their respective area/unit, *or receive a major disciplinary write-up*." 3-ER-343 (emphasis added). Even if there was no mention of the specific six-month restriction for pipe

district court acknowledged, both parties agreed that a six-month restriction exists and proceeded through summary judgment under the joint understanding that it does. 1-ER-11.

Whitford raises this six-month restriction on his eligibility to be a pipe carrier repeatedly throughout the proceedings of his case. *See, e.g.*, 2-ER-82 ("The election of the pipe carrier[]s . . . seems to be an unwritten rule and custom which has been acknowledged by the defendants. I have not been able to identify any specific policy requiring 6 months of clear conduct although I know that this is an unwritten rule."); 2-ER-85-86 (The prison requires incarcerated people in MSP to be "6 months infraction free before they can participate in the 4 religious actions mentioned in number 1-6," naming pipe carrier privileges). At every stage, Defendants have acknowledged this six-month restriction on pipe carriers throughout the proceedings, conceding that it is an undisputed fact. *See e.g.* 3-ER-419–420 (stating it is "[u]ndisputed to the extent that an inmate is required to have six months' clear conduct to stand for election as a pipe carrier."). If the court believed this issue to be in question, it would have been proper to consider the fact disputed, in which case summary judgment should not have been granted on this issue. Fed. R. Civ. P. 56.

**B. Powwow**

_____

carriers, it is not uncommon for prison systems to have practices that impose restrictions without a formal policy.

Second, the Court erred when it held that Whitford's ability to hold and attend a powwow was not substantially burdened because "there is no religious practice to burden" when "no high-side powwow is scheduled." 1-ER-13. This holding shows a fundamental misunderstanding of Whitford's claim and the nature of his religious practice. Whitford does not assert that his religious practice will be burdened at some point in the future when there is a powwow scheduled; Whitford asserts that his ability to engage in a powwow is *currently* substantially burdened because 1) per MSJ policy he cannot attend a powwow on the low-side and 2) he cannot effectively petition for one to be held on the high-side because the clear-conduct policy bars attendance for almost all high-side prisoners, making it impossible to hold a community event. 3-ER-480.

In a sworn affidavit, MSP acknowledged that there was a current petition to hold a powwow on the low-side and that they expected to hold a powwow in December 2023. 3-ER-323. Defendants also acknowledged that, per MSP policy, individuals on "on the high-side are not permitted on the low-side for any reason" which means that no high-side prisoner can currently attend powwow on the low-side even if they were disciplinary-free, including the one in December 2023. 3-ER-335. There is no doubt that at the time of the summary judgment proceedings, Whitford was substantially burdened in his ability to attend the scheduled powwow on the low-side.

Whitford's ability to petition to hold a powwow on the high-side is also substantially burdened. The parties agree that the clear-conduct policy prohibits powwow attendance. 3-ER-36; 3-ER-419–420. This has prevented him from applying for a powwow on the high-side throughout his time incarcerated. 2-ER-86. Additionally, Whitford explained below that there cannot be a powwow on the high-side because powwows are by definition a group practice, and the number of people free of disciplinary infractions is too meager to hold a powwow. 3-ER-480, 3-ER-503. The numbers are stark—Whitford provided evidence that only two people out of twenty who attended a high-side pipe ceremony in October 2023 were disciplinary-free. 3-ER-480. The way that the clear-conduct policy is enforced effectively creates a ban on high-side powwows. *See Greene*, 513 F.3d at 985 (holding that the Court had "little difficulty in concluding that an outright ban" on group worship for someone in disciplinary placement is a substantial burden on religious exercise).

This current, actual injury satisfies the standing doctrine's injury-in-fact requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding injury in fact refers to "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"). Whether an injury is "concrete and particularized" and "actual or imminent" turns on whether the litigant is "'able and ready' to pursue the opportunity at issue."

*Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1159 (9th Cir. 2024) (quoting *Carney v. Adams*, 592 U.S. 53, 60 (2020)). This requirement is in place to ensure that Article III jurisdiction is invoked only to intervene on behalf of currently aggrieved litigants, and to "preclude[] the airing of generalized grievances." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).

Whitford does not air a "generalized grievance" based on a policy preference; he is suing over his own right to practice his religion, which he has devoutly followed for decades and has not been able to practice for nearly ten years. 2-ER-77. His intent to plan and attend a powwow is current: he previously requested and denied the ability to attend a powwow. 1-ER-12. Additionally, Whitford alleges that powwows should occur on an annual basis. 3-ER-516. Thus, absent MSP's policies making group worship at special events impossible on the high-side, Whitford would be planning a powwow for some point in the coming twelve months. If anything, the fact that there is no upcoming powwow on the high-side is evidence that the practice *is* substantially burdened and the district court erred in stating it was speculative. There should be no question that Whitford has standing to proceed and that his powwow practice is substantially burdened.

## C. Sweat Setup

33

Whitford's religion requires him to attend sweat lodge, and the sweat lodge setup is an integral part of the sweat lodge ceremony, not just a practical phase. 2-ER-80. Yet, because the clear-conduct policy applies to sweat lodge setup crew, Whitford is barred from exercising this religious practice. Despite this clear impact on Whitford's religious exercise, the district court held that there was no substantial burden because 1) he could still participate in other religious practices, and 2) sweat lodge setup is not available to all incarcerated people. 1-ER-15–16. The district court erred in both respects.

First, the Court contravened well-established Supereme Court and Ninth Circuit precedent when it held that preventing Whitford from participating in sweat setup was a mere "inconvenience" because he "currently can attend several religious group activities, such as pipe ceremony, talking circle, and sweat lodge." *Id.* This is a classic RLUIPA error—one the Supreme Court has explicitly corrected. RLUIPA analysis must focus on the specific religious exercise in question—here, sweat lodge setup—not unrelated religious practices—here, pipe ceremony, talking circles, and sweat lodge. *Holt*, 574 U.S. at 361.

In *Holt*, the Supreme Court held that a prison grooming policy substantially burdened a prisoner's particular religious exercise even though he had access to other religious practices: "he had been provided a prayer rug and a list of distributors of Islamic material, he was allowed to correspond with a religious advisor, and was

allowed to maintain the required diet and observe religious holidays." *Id.* at 361 (cleaned up). The Court explained that "we must look at the regulation's effect on the specific religious practice at issue"—in *Holt*, growing a half-inch beard—not "whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* at 361–62.

In holding that Whitford's religious practice was not substantially burdened because he is able to engage in other religious practices, the court did not focus on the specific practice in question—the sweat lodge setup—and inappropriately weighed the availability of alternative means of practicing his religion, which "has no bearing on the substantial burden inquiry." *Johnson,* 23 F.4th at 1216 (quotations omitted).

The court also incorrectly held that because Whitford could attend the sweat lodge ceremony, joining the setup crew was unnecessary or an "extra" privilege that he could obtain if he just behaved. 1-ER-15–16. In doing so, the Court characterized being prohibited from sweat lodge setup as an "inconvenience," showing that the court did not credit the sincerity his religious belief that sweat lodge setup is inseparable from sweat lodge itself and carries significant spiritual importance. 1-ER-16. The text of RLUIPA is clear that inquiring into the centrality of a religious practice on a belief is inappropriate. 42 U.S.C. § 2000cc–5(7)(A) ("RLUIPA protects a broad spectrum of sincerely held religious beliefs, including practices that non-

adherents might consider unorthodox, unreasonable or not 'central to' a recognized belief system."). Whitford has alleged sweat lodge setup is a bona fide religious exercise that is integral to sweat lodge ceremony; this claim has not been contested by Defendants. 2-ER-80; 3-ER-428. Neither the district court nor Defendants may reframe this practice as an "extra" or privilege. *See Ackerman v. Washington*, 16 F.4th 170, 184–85 (6th Cir. 2021) ("[W]e must avoid reform[ing] the nature of the desired exercise") (citations omitted).

*Johnson v. Baker* is instructive. In *Johnson*, the plaintiff was a Muslim prisoner who believed he must purify himself with scented oil before each of his five prayers. 23 F.4th at 1213. The defendants argued that he was able to access unscented oil on most occasions and that the use of scented oil was "not really that important to his worship practice—it's just a mere preference." *Id.* at 1215. The Ninth Circuit held unequivocally that "[t]hese argument flout RLUIPA's plain text and our precedent, which prohibits courts from peering into the centrality of a religious practice or whether a particular practice is necessary to the religion." *Id.*

Second, the district court incorrectly held that denying Whitford the ability to apply to be part of sweat lodge setup was not a substantial burden because "it is not available to all inmates as an ordinary part of their religious practice. It is a special responsibility given to a few." 1-ER-16. This framing is flawed. First, though under current policy only four people can carry out the duties of being a part of sweat lodge

setup crew, *all* Native people can be *eligible* to be chosen to be part of sweat lodge setup; only the clear-conduct policy prevents Whitford from being eligible. 3-ER-343–45.

Moreover, the district court misinterpreted case law in this Circuit and sister circuits. In *Greenhill*, a plaintiff had a high security classification because of his ongoing violent disciplinary charges which placed him in segregation. *Greenhill*, 944 F.3d at 246. The plaintiff was an observant Muslim who requested to have access to the Islamic gathering called Jum'ah, and, more specifically, that he practice visually with at least three Muslims via live broadcast. *Id.* at 248. The prison had access to closed-circuit broadcast of the service for other incarcerated people, and the prison had a Step-Down program which allowed prisoners to access more privileges including Jum'ah, but the plaintiff refused to participate in this Step-Down program. *Id.* at 246–47. The Court held that "access to bona fide religious exercise is not a privilege to be dangled as an incentive to improve inmate conduct, and placing such religious exercise in the category of privilege to be earned is fundamentally inconsistent with the right to religious exercise that RLUIPA guarantees to prisoners." *Id.* at 250. "RLUIPA makes clear that inmates' *religious exercise is not a privilege, but a right*." *Id.* at 251 (emphasis in original).

*Greenhill* is similar to the case here. Defendants have provided evidence that their clear-conduct policy is intended to punish those "who recently exhibited

dubious behavior." 3-ER-335-336. Defendants, like prison officials in *Greenhill*, are "dangling" the sweat lodge setup eligibility as an "incentive to improve inmate conduct," treating it as a privilege can be earned after six months. *Greenhill*, 944 F.3d at 250–51.

The district court correctly highlighted that the Fourth Circuit's opinion in *Greenhill* is instructive here because "[a] prison cannot condition participation in a religious practice contingent on an incentive program."1-ER-16. But the court almost immediately contradicted itself after recognizing that *Greenhill* is instructive, holding that "[t]his restriction applies only to one activity that is not available to every practitioner." *Id.* Nowhere in *Greenhill* did the Fourth Circuit draw this distinction. *See* 944 F.3d at 246. And to make such a distinction would contradict the statutory text of RLUIPA, which protects religious exercise practiced by a few. *See Yellowbear v. Lampert*, 741 F.3d 48, 54–55 (10th Cir. 2014) ("Even if others of the same faith may consider the exercise at issue unnecessary or less valuable than the claimant, even if some may find it illogical, that doesn't take it outside the law's protection.").

Further, providing accommodations is a cornerstone of RLUIPA. *Id.* at 62 ("The whole point of RFRA and RLUIPA is to make exceptions for those sincerely seeking to exercise religion"). The district court adhered to flawed reasoning by holding that Whitford "retains control of whether he is eligible to be chosen for sweat

setup." 1-ER-16. As *Greenhill* shows, RLUIPA does not allow a blanket ban on religious practices to promote good behavior. Even if *Greenhill* did make this distinction, it would have no impact here because sweat lodge setup *eligibility* is in fact available to all Native religious practitioners, if not for the clear-conduct policy.

Furthermore, the district court misapplies this Court's decision in *Hartmann v. California Dep't of Corrections and Rehabilitation*, 707 F.3d 1114 (9th Cir. 2013), to hold that there was not a substantial burden because "additional religious accommodations beyond those already provided by the prison to facilitate the religious exercise" are not required. 1-ER-17 (quoting *Hartmann*, 707 F.3d at 1125). This case is distinct from *Hartmann*. There, the plaintiffs were requesting a paid full-time Wiccan chaplain, even though they already had access to a volunteer Wiccan chaplain and assistance of staff chaplains. *Hartmann*, 707 F.3d at 1122. The Court held that there was no substantial burden because the plaintiffs did not dispute that they already benefit from those Wiccan chaplains, albeit not of the quality they would like. *Id.* 1122–25.

This is not a case where Whitford is already able to access to sweat lodge setup and is arguing the quality is not up to par—he has no access to it at all. *See Austin v. Brown*, No. 3:18-CV-600-WQH-JLB, 2019 WL 2868925, at *4 (S.D. Cal. July 3, 2019) (distinguishing *Hartmann* because the plaintiff was not receiving access to any Buddhist religious volunteers for six weeks); *Nance v. Miser*, No. CV-

12-0734-PHX-RCB, 2013 WL 6196289, at *3–4 (D. Ariz. Nov. 27, 2013) (distinguishing *Hartmann* where the plaintiff was requesting Halal meat even though he was provided other Halal vegetarian food). Thus, the court erred in not holding that Whitford's religious practice was substantially burdened.

## II. The Court Erred When It Held that Defendants Had a Compelling Interest to Deny Whitford's Religious Practices

Defendants have failed to carry their burden to show a compelling interest in limiting Whitford's religious practice because they provided generalized evidence and directly addressed only one of the four practices from which Whitford is excluded.

Once a prisoner demonstrates that a policy substantially burdens his religious exercise, the burden shifts to the prison to show a compelling government interest. 42 U.S.C. § 2000cc-1(a). While prison security may qualify as a compelling interest, courts do not "grant unquestioning deference to the government's claim of a general security interest." *Johnson*, 23 F.4th at 1217 (internal quotation marks omitted). Rather, the prison must meet a "focused inquiry" based on "detailed evidence, tailored to the situation before the court"—including the supposed compelling interest in applying the challenged policy to the particular claimant. *Holt*, 574 U.S. at 363; *Warsoldier*, 418 F.3d at 1000. Conclusory, speculative, or generalized evidence is insufficient to meet RLUIPA's exacting standard. *Warsoldier*, 418 F.3d at 1001 at 363.

40

## A. Defendants Did Not Provide Sufficient Evidence to Restrict Sweat Setup, Drum Group, or Pipe Carrying

Though Whitford conceded below that security interests generally may be a compelling interest, he disputed that Defendants had provided *sufficient* evidence tailored to each of his religious practices to show that their interest was compelling. *See* 2-ER-78–79.

Whitford argued below that the security concerns "make no sense other than to create an added layer of restrictions in order to coerce better behavior out of participants," especially because people with disciplinary infractions can attend the sweat ceremony and pipe ceremonies but not the sweat setup or drum group, or carry the pipe, even though they are held in the same place, at the same time, with the same people. 2-ER-152. Furthermore, he pointed to inconsistencies in the security justification for special activities, explaining that it does not make logical sense "that [he and others] are allowed to go to visiting [even if they] have had an infraction within the last 6 months and to participate in regular visiting room activities regardless of our infraction history, yet [they] are not allowed to have a special activity without a 6 month fee period of good behavior." 2-ER-154. He also rightfully acknowledged that the clear-conduct policy contradicts MSP's own disciplinary policies which state that an activity can be restricted only when the violation involves that same activity. 3-ER-492.

The court erred in holding that Defendants have demonstrated a compelling interest in denying each of Whitford's required religious practices because Defendants did not provide sufficient detailed evidence. The court held that Defendants had a compelling interest because they "assert security concerns as their overarching reason for restrictions on prisoner movement and possessions" and "provide sufficient firsthand knowledge to support their conclusions that the RAC and special activities are places where inmates pass contraband and unauthorized communications to occur," citing an affidavit. 1-ER-18. But these general statements regarding prison security are not enough to pass muster.

In fact, Defendants provided additional information regarding only their denial of powwow in particular; they do not provide any specific information regarding their security justifications for any other religious practice. 3-ER-335–38. This omission on its own is reason to reverse the district court's grant of summary judgement, as the court simply applied Defendants' blanket security interests provided for powwow to all other religious practices. *See Holt*, 574 U.S. at 364 ("RLUIPA, however, does not permit such unquestioning deference.")

Indeed, Defendants did not explain why it is necessary to restrict access to sweat lodge-setup crew, drum group, or pipe carrier eligibility in any of their affidavits or evidence. Defendants offered generalized testimony about individuals passing contraband and unauthorized communication, but they provided no

substantive evidence showing a particular concern regarding these religious practices in particular.

It is unclear why Native religious services Whitford poses a specific security concern warranting a prohibition for six months following an infraction. For example, Defendants provided no evidence showing particular security interests in restricting drum practice as opposed to other church music groups. Nor did they provide evidence showing how the sweat lodge setup poses a specific security concern, particularly given that Whitford is able to attend the sweat lodge ceremony, which occurs with the same people and in the same area. Whitford raised these inconsistencies throughout his briefing prior to summary judgment but Defendants never provided any evidence to address this. *See* 2-ER-152–53

Defendants do not address why the security measures already provided for the Native religious practices are insufficient to address their security concerns. Incarcerated people who wish to attend all Native services must undergo a series of security checks including verifying their identification credentials, undergoing random pat searches before and after leaving RAC, being subject to unclothed body searches, and staff thoroughly inspect religious areas before and after ceremonies. 3-ER-343–45. Additional measures are taken for specific practices—for example, the sweat lodge setup crew is supervised by RAC staff during all times of the sweat setup. 3-ER-342. Similar close monitoring is conducted of pipe carriers. Each sacred

pipe is kept and stored in a secure storage unit by the pipe carriers under direct supervision of a staff member. 3-ER-343. RAC staff are responsible for completing the inventory of tobacco used for pipe ceremonies and thoroughly inspecting the area and the materials used. 3-ER-344. Defendants do not show why these ample security measures are insufficient to address their compelling interest or why the clear-conduct policy is necessary. Additionally they do not address why the clear-conduct policy is necessary when MSP's own disciplinary policies—which seemingly attempt to resolve security concerns— state that an activity can only be restricted when the violation involves that same activity. 3-ER-492.

The Supreme Court in *Holt* and subsequent cases instructed that prisons must meet a "focused inquiry" based on "detailed evidence, tailored to the situation before the court"—including the compelling interest in applying the challenged policy to the particular claimant. *Holt*, 574 U.S. at 363; *see also Warsoldier*, 418 F.3d at 1000. In *Holt*, the defendants offered a similar security justification—circulating contraband—to deny a Muslim prisoner from growing a half-inch beard. *Holt,* 18 F.3d at 363–64. The Court held that it was necessary for the district court to closely examine the proffered security justification when defendants provided no specific evidence about why these religious practices raised a specific concern regarding passing contraband. The Court held that the district court simply deferred to

44

defendant's blanket justification without requiring more, which was reversible error. *Id.* at 364.

Accordingly, this Circuit has required prisons to provide very detailed evidence regarding whether their interest is in fact compelling, refusing to take blanket statements at face value. *See Shakur*, 514 F.3d at 887, 889–90 (holding a conclusory declaration about Kosher-meal costs was not sufficient evidence to show a compelling interest and pass RLUIPA standards); *Nance*, 700 F. App'x at 632–33 (holding defendants did not show a compelling interest in denying scented oil even though they argued that scented oil could be used to hide contraband, because they did not show how it could not meet their compelling interest to provide the oils in the presence of a chaplain). Here, the district court erred in not conducting a focused inquiry based on detailed evidence, tailored to the situation before the court, when it simply deferred to the Defendants' blanket statements regarding a security interest in denying Whitford's religious practice without more.

### B. Defendants' Arguments Regarding the Compelling Interest in Preventing Access to Powwow Rely on Erroneous, Unreliable Evidence

Even in the context of the powwow, the court erred in finding that Defendants provided sufficient evidence of a compelling interest in restricting access to powwow. The court held that "in the powwow context, the affidavit of Billie Reich, current DOC Grievance Manager, states that MSP put the six-month policy in place to 'prevent inmates who recently exhibited dubious behavior from attending' 'after

inmates were assaulted, contraband was trafficked, sexual assaults occurred, and gang members planned and conducted fights and assaults." 1-ER-18–19.

First, the only affidavit provided by Defendants to support their compelling interests in restricting access to powwow was written by a DOC grievance coordinator; there is reason to doubt whether he has sufficient first-hand knowledge regarding the reasons for instituting the clear-conduct policy, as grievance officers are often tasked with resolving prisoner complaints, and are not often involved in passing policies. This Court has held that when evidence in the form of affidavits is provided by officers who do not have the knowledge or authority to provide evidence regarding a prison's compelling interest in a specific policy, Defendants cannot meet their burden. *Shakur*, 514 F.3d at 889–90 (holding a district court's reliance on an affidavit by a prison administrator who could not speak to costs of implementing a religious diet was "troubling," "especially because the government bears the burden of proving the existence of a compelling state interest"). Therefore, it was error for the district court to hold that Defendants "provided sufficient firsthand knowledge to support their conclusions." 1-ER-18.

Even assuming this affidavit is sufficient, Defendants do not meet their burden to show a compelling interest in denying access to powwow for everyone with disciplinary infractions in the last six months. Though Reich stated that during special activities, prisoners were assaulted, fights planned, or contraband trafficked,

this is again simply a blanket justification regarding general concerns regarding religious *and* non-religious special activities; it is not applied to the powwow context in particular. 3-ER-336–38. Reich did not provide evidence that this type of behavior occurred during powwows in the past, or why only the clear-conduct policy is necessary for security risks in the future, when it applies only to *religious* special activities. Though Reich cited various exhibits throughout his affidavit, he provided absolutely no evidence of these disciplinary issues occurring. *Id.* Furthermore, the incident reports in Native American ceremonies attached by Defendants make no mention of assaults, sexual assaults, fights, or trafficking. 3-ER-373–414. Also, no incidents have occurred related to Native American ceremonies within the last 5 years, and none involve Whitford. *Id.*[4]

Furthermore, Defendants' clear-conduct policy acts as an incentive program, which the Fourth Circuit's persuasive authority in *Greenhill* explicitly prohibits as a compelling interest. 3-ER-328. Reich acknowledges that MSP officers restrict religious activities to promote "trustworthiness" or prevent those with "dubious behavior" from engaging in these practices. 1-ER-18–19. This purported justification mirrors the defendants' proffered security concerns in *Greenhill*, where

---

[4] The court was incorrect when it held that Whitford "does not contest that these illicit activities occurred." 1-ER-19. Whitford clearly objected to this in his response to Defendants' Statement of Undisputed Facts and stated he was unaware of these kinds of activities ever happening, requesting additional discovery to investigate these claims. 3-ER-502.

defendants used the step-down program to refuse a prisoner's access to Jum'ah services. 944 F.3d at 251. This rationale is "inconsistent with both RLUIPA's text and Congressional intent, as RLUIPA makes clear that inmates' religious exercise is not a privilege, but a right." *Id.* Thus the court erred in holding this interest was compelling.

Defendants also raise staffing as a reason to deny Whitford access to powwow. They argue that "many extra staff would be required" to take Whitford to a low-side powwow, including at "minimum three correctional officers depending on the total number of inmates attending" especially because "some inmates have to be separated" for their safety. 3-ER-336–38. First, Whitford requests to hold a powwow on the high-side of the prison and Defendants provide no compelling interest regarding why that is not possible. *Id.* This request, on its own, is reason to reverse summary judgement, as it creates a genuine dispute of material fact.

Second, Defendants essentially raise a cost and resource issue related to staff but do nothing to quantify in concrete terms how much their budget or staff would need to increase in order to allow Whitford, a single incarcerated person, to attend powwow on the low-side. An increase in three staff people to escort a prisoner, on its own, does not raise a compelling interest, as RLUIPA's mandate "may require a government to incur expenses in its own operations," 42 U.S.C. § 2000cc-3(c). This is especially true when those expenses represent a small percentage of a prison's

48

aggregate expenditures. *See Shakur*, 514 F.3d at 887, 889–90 (finding no compelling interest where accommodation was estimated to cost $1.5 million); *Moussazadeh*, 703 F.3d at 795 (characterizing even the $88,000 annual cost of serving kosher meals to all observing inmates as "minimal"); *Beerheide v. Suthers*, 286 F.3d 1179, 1191 (10th Cir. 2002) (holding that preventing a $13,000 expenditure for a religious practice—out of a budget of over $8 million—did not constitute a compelling government interest, even under rational-basis review).

A Tenth Circuit case, *Yellowbear v. Lampert*, is instructive. 741 F.3d 48 (10th Cir. 2014). In *Yellowbear*, the plaintiff was on the high-security side of the prison because of disciplinary infractions he had committed, and he requested to be taken to sweat lodge on the lower security, general population side. 741 F.3d at 53. The defendants there, like MSP Defendants here, argued that the cost of providing the necessary security to take the plaintiff to the sweat lodge on the general population side was unduly burdensome and would require them to lock down the prison or place the plaintiff in contact with non-protective custody prisoners, which they said was a security and cost issue. *Id.* at 59. Then-Circuit Judge Gorsuch held that there was no compelling interest because the defendants did not even attempt to quantify the costs of more security, and there was insufficient evidence of a security risk in sweat lodge. *Id.* at 58–59. The court was clear that deference to prison official does not mean that they can assert a security justification "by fiat." *Id.* at 59; *see also*

49

*Haight v. Thompson*, 763 F.3d 554, 562–64 (6th Cir. 2014) (holding that defendants' concerns that they could not adequately observe maximum security prisoners on death row in sweat lodge did not create a compelling interest because there were other instances where people are not directly observable, such as in the showers).

Because Defendants here similarly fail to quantify the costs of additional security to take Whitford to a powwow on the low-side, or to provide information about the ability or cost to host a powwow on the high-side, Defendants fail to meet their burden of showing a compelling interest.

### III. The District Court Erred in Holding that Defendants' Clear-Conduct Policy is the Least Restrictive Means Necessary to Achieve Their Purported Compelling Interest

RLUIPA's requirement that the prison show that any compelling interest is pursued in a manner least restrictive of religious exercise is an "exceptionally demanding" one. *Holt,* 574 U.S. at 353. The prison must demonstrate it "actually considered and rejected the efficacy of less restrictive measures" before implementing its policy. *Warsoldier*, 418 F.3d at 999. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365 (quotation marks omitted). The prison must "set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner." *Warsoldier*, 418 F.3d at 1000 (internal quotation omitted).

Defendants' clear-conduct policy is not the least restrictive means to achieve its stated compelling interest, as Whitford provided many alternatives to address Defendants' security concerns. Whitford raised alternatives for his religious practices including sweat setup, drum group, pipe carrier, and personal pipe use by pointing to his experience in WDOC. Whitford testified that he served ten years in WDOC where he was able to practice drumming, powwow, sweat setup, and could be elected as a pipe carrier on a consistent basis. 2-ER-148. In WDOC, ceremonies include quarterly sweat days and pipe days, and change of seasons ceremonies with seven days of sweat activities. *Id.* Incarcerated people are "able to have the proper amount of time to attend to the sweat activities and those activities are not separated based on sweat set up crew vs. the rest of ceremonial participants." 2-ER-149. Additionally, in WDOC, annual powwows with guests are consistently celebrated. 2-ER-148–49. These annual powwows are "made available to all general population inmates of all custody levels (including closed custody level[s])." *Id.* These powwows are supported by a year-round Culture Class where incarcerated people create dance outfits for themselves or their relatives, create gifts to give away, and practice dancing, signing, and drumming. 2-ER-149.

He argued that the WDOC raises questions regarding whether the disciplinary policy is the least restrictive means to achieve the government's compelling interests. He explained, "none of these activities are prohibited in any way, shape or

51

form. All inmates are able to attend unless they specifically violate the principals and rules of that specific religious activity or the rules regulating those activities." 2-ER-149.

### A.  The District Court Erred in Holding that Barring Access to Drum Group Was the Least Restrictive Means

The district court addressed only whether Defendants used the least restrictive means in denying drum circle and the personal pipe. 1-ER-20–21. The court correctly held that Defendants did not meet their burden of proving that they used the least restrictive means to deny the use of a personal pipe when Whitford raised his experience in the WDOC, where personal pipes may be used in controlled outdoor circumstances. 1-ER-21. The district court pointed to this Circuit's longstanding precedent that "the failure of a defendant to explain why another institution with the same compelling interest was able to accommodate the same religious practice may constitute a failure to establish that the defendant was using the least restrictive means." *Shakur*, 514 F.3d at 890–91 (citation omitted).

Yet, the court did not apply that same precedent to the drumming group. Instead, it incorrectly held that denying drum circle to those with disciplinary infractions is the least restrictive means. The court made this holding even though "Defendants do not explicitly state that they have considered other approaches," instead crediting "their discussion of the various issues of contraband and violence related to group activities, and their imposition of a six month conduct policy as a

result, prove sufficient to demonstrate that this restriction on drum practice passes muster." 1-ER-20. These two holdings are inconsistent and cannot be squared with this Court's precedent.

For the drumming group, Whitford raised less restrictive alternatives by providing his experience with WDOC (much like he did for the personal pipe), asserting that drumming was provided on a consistent basis throughout the year through the Culture Class and was not restricted in any manner if someone had a disciplinary infraction. 2-ER-149–50. Defendants did not show why they cannot provide access to the drum group when WDOC can. According to MSP's own records, only three incarcerated people in the high-side have attended drum group since 2017, even though there is capacity for sixteen participants, which raises a genuine dispute that MSP policy is not the least restrictive means, as it overly burdens religious exercise to those on the high-side. 3-ER-328; 3-ER-349. By failing to provide any evidence regarding the need for this restriction on drum group, Defendants necessarily fail to meet their burden of showing the least restrictive means. *See Holt*, 574 U.S. at 371 ("[T]he phrase 'least restrictive means' is, by definition, a relative term. It necessarily implies a comparison with other means."); *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016) (reasoning in an analogous context that "[a]t a minimum, the government must address those alternatives of which it has become aware during the course of [the] litigation").

The district court was correct that *Warsoldier v. Woodford* and *Shakur v. Schriro* are instructive. In *Warsoldier*, the plaintiff, a Native prisoner requested an exception to the disciplinary policy that prevents incarcerated people from keeping their hair long because his Native religious practice required it. 418 F.3d at 992–93. Defendants provided only "conclusory statements that their hair grooming policy is the least restrictive means to ensure prison security." *Id.* The Court held that "even outside the context of a minimum-security facility, CDC cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Id.* at 998–99. This Court looked to other prison systems' hair length policies and held that because defendants offered no explanation why these prison systems are able to meet their indistinguishable interests without infringing on their inmates' right to freely exercise their religious beliefs they did not meet their burden. *Id.* at 1000; *see also Shakur*, 514 F.3d at 890–91 (holding that denying Halal meat was not the least restrictive means when the plaintiff pointed to WDOC which serves Halal meat, to show there were lesser restrictive means). Similarly, Whitford provided ample alternatives and exemplary policies in other institutions to argue that MSP's clear-conduct policy is not the least restrictive means to meet their security needs, but Defendants utterly failed to grapple with any of them.

The district court inappropriately construed the facts in favor of Defendants—facts which were never presented—which conflicts with the standard at the summary judgment phase that requires all inferences to be resolved in favor of the nonmoving party. Fed. R. Civ. P. 56; *Scott*, 550 U.S. at 378 (2007). The district court's analysis also conflicts with the mountain of authority that instructs courts not to simply assume less restrictive means or defer to prison officials by fiat. *See Warsoldier*, 418 F.3d at 1000; *Shakur*, 514 F.3d at 890–91; *Greenhill*, 944 F.3d at 250–51; *Williams v. Annucci*, 895 F.3d 180, 192 (2d Cir. 2018); *Ali v. Stephens*, 822 F.3d 776, 786 (5th Cir. 2016) (holding courts cannot simply "[defer] to these prison officials' mere say-so" and "must hold prisons to their statutory burden, and they must not assume a plausible, less restrictive alternative would be ineffective") (citations omitted). For all these reasons, the district court's least-restrictive-means analysis for the drumming group was erroneous.

### B. Denying Access to Powwow, Sweat Setup, and Pipe Carrier Was Not the Least Restrictive Means

Though the court did not address whether the clear-conduct policy was the least restrictive means on other religious practices including powwow, sweat lodge setup, and pipe carrier eligibility, Defendants fail on this prong for these practices for similar reasons.

### i. Powwow

The only religious practice Defendants directly address in any of their evidence is the ability of Whitford to attend powwow. Whitford provided an alternative to bringing him to the low-side powwow to resolve the staffing and security concerns: allowing him to conduct a powwow on the high-side by lifting the clear-conduct policy. 3-ER-503. Yet, Reich's affidavit addresses only Whitford's ability to attend a powwow on the low-side, and never addresses the proposed powwow on the high-side. 3-ER-335–37. This omission is reason to deny summary judgment as it raises a genuine dispute of material fact.

Although Reich raises issues regarding sufficient staffing and the need to separate certain incarcerated people if high-side residents were taken to the low-side powwow, Defendants never quantified costs or specified what resources are necessary to provide Whitford with access to a low-side powwow. 3-ER-335–37. Reich also failed to address why Whitford could not host powwow on the high side, even though other special activities are held on the high-side. 3-ER-494. Defendants did not address Whitford's claims that WDOC regularly holds annual powwows for all custody levels regardless of disciplinary issues, nor did they explain why MSP cannot do the same. 2-ER-148; 3-ER-335-37.

The analysis at this prong is akin to *Greene*, where this Court held that defendants did not show that denial of group worship for someone in disciplinary segregation was the least restrictive means. 513 F.3d at 988–89. The defendants

attempted to argue that the maximum-security area in the jail did not have available space for group worship and that the only space available was in the minimum-security area. *Id.* The Court held that because the defendants did not show they considered alternatives to a total ban on religious worship—such as those alternatives provided by the plaintiff, including holding worship in the law library, which max-security prisoners regularly access—summary judgment was inappropriate. *Id.* at 989–91. This Circuit reiterated, "no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison. RLUIPA requires more. Prison officials must show that they actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Id.* at 990 (quoting *Warsoldier*, 418 F.3d at 999).

Like the defendants in *Greene* did not consider the law library—a space where high security prisoners could already access—Defendants here never addressed allowing Whitford to hold a powwow on the high-side, where high security prisoners regularly access common spaces. Because Defendants did not consider this alternative, the district court erred in granting summary judgment to Defendants.

**ii.    Sweat Setup and Pipe Carrier Eligibility**

Whitford provided alternatives for the sweat lodge setup, arguing that the sweat lodge setup should either not be a separate activity but part of the sweat lodge

ceremony itself, or that the clear-conduct policy should not apply, as he sincerely believes this is an integral part of religious exercise. 2-ER-80. He asserts that in WDOC, sweat lodge setup is not divided from sweat ceremony and no clear-conduct policy bars participation. 2-ER-149. He also raised that he was eligible and actually elected as a pipe carrier in WDOC, where there were no disciplinary requirements in the prison. *Id.* Again, Defendants do not address these alternatives besides simply describing their own policies. 3-ER-318–39.

Though Defendants assert general statements about the intent of the clear-conduct policy, these generalizations cannot meet RLUIPA's demanding least-restrictive-means test. Even taking as valid their concerns regarding the need for clear conduct, Defendants do not address why a six-month restriction is necessary to meet their security interests. Why not one month instead of six? Could the restriction be narrowed to disciplinary violations of the rules regarding religious practices only, as in WDOC—and as MSP's other policy already provides? *See* 2-ER-227 (allowing as a form of discipline the restriction from participation in religious activities "when the violation involves that activity or the rules regulating it"). Or could the restriction be limited to only violent disciplinary infractions? Defendants fail to answer these commonsense questions that a court would rightly pose as conducting its least restrictive means inquiry. By ignoring these questions, the district court committed grave error.

## CONCLUSION

This Court should reverse and remand the district court's partial grant of summary judgment to the Defendants.

Respectfully submitted,

*/s/ Amaris Montes*
Amaris Montes
Lillian Novak
D Dangaran
Rights Behind Bars
1800 M St. NW Fnt. 1 # 33821
Washington, DC 20033

*Attorneys for Appellant Makueeyapee Whitford*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(c)(1) and Local Rule 28.1-1(b) because this brief contains 13, 605 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date: November 18, 2024

*/s/ Amaris Montes*
Amaris Montes
Rights Behind Bars
1800 M St. NW Fnt. 1 # 33821
Washington, DC 20033
*Attorney for Appellant Makueeyapee Whitford*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

The undersigned filer also certifies that this paper copy of the brief is identical to the version submitted electronically.

Date:  November 18, 2024

*/s/ Amaris Montes*
Amaris Montes
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
 *Attorney for Appellant Makueeyapee Whitford*