No. 24-3340, 24-3177

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

MAKUEEYAPEE D. WHITFORD,

*Plaintiff-Appellant,*

v.

JIM SALMONSEN, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Montana
No. 22-70-H-BMM-JTJ
Hon. Brian Morris

_____

## PLAINTIFF-APPELLANT'S OPPOSITION TO APPELLEES' MOTION
## TO DISMISS

_____

Amaris Montes
Samuel Weiss
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
202-455-4399
amaris@rightsbehindbars.org
*Attorneys for Plaintiff-Appellant*
*Makueeyapee Whitford*

i

## STATEMENT OF FACTS

Plaintiff-Appellant Makueeyapee Whitford is an enrolled member of the Blackfeet Nation and is a devout practitioner of Native religious practices. The Blackfeet Nation originates from ancestral lands in Montana, and Whitford has deep spiritual ties to the land itself including where Montana State Prison is located and the territories that surround it. Ex. A.  For example, Montana State Prison is located in what Blackfeet Nation calls the Sweetgrass Hills, an important spiritual location in the stories of his people. *Id.*  Deer Lodge—the city where MSP is located—was a sacred site to pray for his tribe. *Id.*  Neighboring territories hold deep significance, such as the Sand Hills near Shelby, Montana where Blackfeet people believe they go to die. *Id.*  This connection to sacred sites in Montana is immensely important to Whitford, as he considers it the "basis of the belief system of [his] people." *Id.*

Whitford was incarcerated in Montana State Prison (MSP) for the last ten years. 2-ER-148. While incarcerated in MSP, Whitford was consistently barred from various religious practices such as powwow, sweat lodge setup, drumming practice, and serving as a pipe carrier because MSP requires six months of clear conduct to practice these religious ceremonies. *See* 3-ER-340–49.  He was also denied the ability to carry a personal pipe for religious purposes. 2-ER-42; 3-ER-488. Whitford is a vocal advocate for his and other prisoners' rights. 2-ER-78; 3-ER-469. Prison officials punished him in retaliation for his advocacy, which further impacted his

1

ability to access these necessary religious rights. 2-ER-78, 2-ER-152; 2-ER-186; 3-ER-469; 3-ER-500.

On August 8, 2022, Whitford filed the instant action alleging violations of the Religious Land Use Institutionalized Persons Act (RLUIPA) and the First Amendment of the U.S. Constitution related to these denials of religious rights. ECF 2. He also included Due Process Clause claims, alleging that officers gave him disciplinary infractions without sufficient due process as a method of retaliation for his continued advocacy and intentionally restricted access to legal proceedings. ECF 2 at 1–12. Though his Due Process claims were dismissed, when Whitford amended his complaint he included information concerning the retaliatory treatment by officers during disciplinary hearings to demonstrate that it worsened the religious rights violations under RLUIPA. 2-ER-40–42; 46.

Throughout the proceedings, officers caused systematic barriers for Whitford to vindicate his rights in court. He sought a court order preventing officers from restricting his access to typewriters, writing supplies, legal search engines, and notary services to prevent him from preparing to file his motion for summary judgment. ECF 50 at 1–2. Defendants did not substantively deny these allegations but only argued that Whitford did not meet the elements required for a preliminary injunction. ECF 59. In his reply, he sought guidance from the court on whether he should amend his complaint to include a separate claim regarding retaliation and

2

attached an affidavit describing retaliatory treatment, including a statement by an officer saying, "What happens if nobody goes by the rules?" to justify preventing him access to legal resources. ECF 68 at 7; ECF 68-1 at ¶ 68. He also wrote grievances regarding this retaliation. *Id.* at ¶ 39. The district court never addressed this request and both Whitford and Defendants filed their competing Motions for Summary Judgment soon thereafter. 2-ER-60–75; 2-ER-269–299.

On December 20, 2023, the district court granted Defendants' Motion for Summary Judgment for Whitford's RLUIPA claims about powwow, sweat lodge setup, drumming practice, and eligibility to serve as a pipe carrier. 1-ER-23. The district court entered permanent relief for Whitford on the personal pipe issue, directing the Defendants to provide incarcerated people with the ability to purchase personal pipes and provide a secure area to use them. 1-ER-24–34.

Whitford timely filed his notice of appeal on May 10, 2024. 3-ER-531. On May 24, 2024, Defendants filed a notice of cross-appeal regarding the judgment on access to personal pipes. ECF 87. On June 27, 2024, Counsel for Whitford filed their Notice of Appearance. Dkt. 16.

Five days later—on July 2, 2024—Defendants contacted New Jersey and requested to transfer Whitford to their custody via the Interstate Correctional Compact (ICC). Mot. Exhibit A 1; Exhibit C ¶ 4. Defendants' request named

disciplinary reasons for the transfer. Mot. Exhibit A at 1. In 2023, Whitford obtained a handful of disciplinary infractions regarding failure to follow directives. 1-SER-002–013. In all of 2024, the year of the request, Whitford obtained only two disciplinary infractions arising from the same issue on March 28, 2024, meaning he did not have any disciplinaries immediately preceding Defendants' transfer request in July. Ex. A ¶ 24. In 2025, Whitford has not obtained any serious behavioral disciplinary infractions. *Id.*

On November 6, 2024—amidst the appellate briefing schedule—New Jersey accepted the request of Whitford's request for transfer. Mot. Exhibit C ¶ 6. When Whitford became aware of the transfer, he wrote to staff requesting more information, detailing potential further risks to his religious rights. Ex. A ¶ 23. He requested that if they insist on transferring him it should be to the Washington State Department of Corrections (WDOC) because they had the religious rights services he required and he has tribal ties to this area. *Id.* MSP officials never responded to his request for information. *Id.*

Defendants filed their Answering Brief on January 17, 2025, dropping their own cross-appeal concerning the injunction for personal pipes. Ans. Br. 3. n.1. Whitford was transferred to New Jersey State Prison (NJSP) two days later on January 19, 2025. Mot. Exhibit B at ¶ 7. Whitford was taken directly to NJSP and transferred in an unmarked car for 36 hours without stops or breaks. Ex. A ¶ 25.

4

Transportation officials repeatedly asked him why he was being transferred, since the process for the transfer was so out of the ordinary according to their usual process, which allows for stops in other jails or breaks along the way. *Id.* Upon arrival, NJSP officials told Whitford that Montana officials informed them that he was being transferred because he was part of Pride—a Native American gang. Ex. A ¶ 26. Whitford has never been part of this gang and, because there was no information corroborating his involvement in a gang, Whitford was not classified as a Pride member in NJSP. Ex. A ¶¶ 26–27.

Whitford was immediately placed in administrative segregation where he is restricted to his cell for 20 hours a day. Ex. A ¶ 28. He was placed in this high security placement, with no review for at least 90 days, even though according to his understanding and belief, he has sufficient good behavior to be in a lower-security setting. *Id.*

Since being at NJSP, Whitford has no access to many Native religious ceremonies at all. Ex. A ¶ 19. He has no access to sweat lodge or group prayer services. *Id.* He cannot pray individually either, as NJSP does not allow any smudging materials including sage or sweetgrass. *Id.* Prison officials confiscated many of Whitford's religious items including sweetgrass, ocean root, lavender, sage, eagle feathers, and his dream catcher. *Id.* He has attempted to file grievances to

5

address these religious rights violations, but has been prevented from doing so. Ex. A ¶ 20.

On March 28, 2025, because of his disconnection from his land, community, and access to religious services, Whitford attempted to commit suicide by hanging himself. Ex. A ¶ 22.

On April 22, 2025, Defendants filed a Motion to Dismiss arguing the appeal is moot because Whitford was transferred to NJSP. Mot. 2. Defendants argue Whitford is no longer subject to the policies he challenged below and thus would not receive any benefit of relief that the Court may grant. Mot. 6.

As of the date of this filing, Whitford does not appear in the New Jersey Department of Corrections "Offender Search" information system by name or number as provided by NJDOC officials. Exhibit B.

## ARGUMENT

As Defendants correctly note, this Court's jurisdiction is limited to live cases and controversies. Mot. 5. "The central question for mootness is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled *any occasion for meaningful relief*." *Meland v. WEBER*, 2 F.4th 838, 849 (9th Cir. 2021) (emphasis added). A case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff. *See Rezaq v. Nalley*, 677 F.3d

6

1001, 1008–10 (10th Cir. 2012) (citing *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–13 (1992)). Defendants bear the burden of demonstrating that a case is moot, i.e. that facts have changed such that Whitford has no occasion for meaningful relief. *Ctr. For Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007). The burden of demonstrating mootness "is a heavy one.'" *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

Whitford's transfer did not moot his equitable claims as courts retain the ability to effectuate some relief in this dispute for four different reasons. First, Defendants have failed to meet their heavy burden of showing Whitford will not be subject to the same injury again given the suspicious timing of this transfer and lack of assurances that Whitford will not return to MSP. Second, under the Interstate Corrections Compact some of the legal rights at issue in this case followed Whitford to New Jersey. Third, Whitford has a plausible argument that the transfer itself violated RLUIPA. Finally, Whitford has a plausible argument that Defendants violated his First Amendment rights in transferring him to punish him for his legal advocacy. Because Defendants have not met their burden of demonstrating that this case is moot, this Court should not dismiss Whitford's appeal.

## I. Defendants Have Not Met Their Burden of Showing Whitford Will Not Be Transferred Back to MSP, Making the Case Not Moot.

"A case might become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189, (2000) (emphasis added). If there is a reasonable expectation that a transferred prisoner will be returned again to the prison or the injury will occur again, then the transfer does not moot the prisoner's claim. *Washington v. Harper*, 494 U.S. 210, 218–19 (1990).

Defendants provide no certainty that Whitford will not be transferred back to Montana, making the controversy capable of repetition. Defendants include an affidavit by the Administrative Specialist for MSP, Carla Strutzel, as their only evidence regarding Whitford's future treatment. Mot. Exhibit B. Her only statement regarding Whitford's potential to transfer back is that "[t]here are currently no plans for Mr. Whitford to return to MSP any time in the future." Mot. Exhibit B ¶ 8. This statement alone is insufficient to meet their heavy burden for a number of reasons. First, there is reason to question whether an Administrative Specialist has the authority and ability to determine decisions regarding appropriate placement and definitively represent that Whitford will not be transferred back to MSP. *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) ("[c]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient.") Second,

8

a declaration stating that "there are currently no plans" to return Whitford to MSP does not affirmatively state he will not be transferred back—just because there are no "current plans" for him to return, it does not speak to future plans to transfer him back or guarantee that he will not be transferred back. Thus, Defendants have failed to meet their heavy burden of showing that Whitford will not experience the same injury. *See Washington v. Harper, 494 U.S. 210,* 219 (1990) (holding that prisoner's claims were not moot despite prisoner's transfer to a non-offending facility, given that the "[t]he alleged injury would likely recur"); *Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975) (concluding that prisoner's transfer did not moot case when "defendants were unable to advise that [the prisoner] would not be returned to the [complained-of prison]"); *Lemcool v. Fla. Dep't of Corr.*, 543 F. App'x 909, 913 (11th Cir. 2013) (holding that a prisoner's religious rights claim was not moot because she could be transferred back to the same prison and the prison system had a history of doing so).

These underlying circumstances suggest that Defendants may have transferred Whitford to avoid the Court's jurisdiction and could transfer Whitford back at any point if they succeed in disposing of this case. The timing and method of Whitford's transfer are particularly troubling. Defendants requested Whitford's transfer five days after counsel entered an appearance for Whitford who previously appeared *pro se*. His transfer was approved within two days of Defendants' decision

9

not to appeal his ongoing injunctive relief, Mot. Exhibit C, and his transfer included such unusual processes that transportation officials themselves noted how especially peculiar it was. Ex. A ¶ 25. Whitford does not even appear on New Jersey State's inmate tracker, suggesting he is not formally recognized in the system despite being held there over four months. Ex. B.

*Doe v. Wooten* is instructive. 747 F.3d 1317, 1323 (11th Cir. 2014). In *Doe*, the plaintiff was held in United States Penitentiary (USP) Atlanta and alleged Eighth Amendment claims against the Bureau of Prisons (BOP) for a failure to protect him from harm. *Id.* at 1321. Immediately before trial, BOP transferred the plaintiff to a state facility in the Colorado Department of Corrections and included an instruction in their system that the plaintiff should not be assigned or transported back to USP Atlanta. *Id.* Defendants moved to dismiss the case, which the district court granted. The Eleventh Circuit reversed. In its analysis, the court noted that the "BOP never said [the plaintiff] will not be transferred back to a high security facility" and because "BOP makes indirect statements about how the record does not show any evidence that [plaintiff] will not be moved" this "[does] not carry the day." *Id.* at 1324. Furthermore, the court stressed that the "timing suggests a change was made simply to deprive the District Court of jurisdiction" when "the BOP was able to make arrangements for [the plaintiff's] transfer to Colorado in a matter of months or less, which is a remarkably short period of time after years of inaction." *Id.* at 1325. It

10

explained, "[n]either is there evidence of any substantial deliberation. The BOP does not explain why it decided to make the transfer now, when it had failed to do so earlier." *Id.* at 1325.

Defendants have done even less than the defendants in *Doe* to assure that Whitford will not be returned to MSP. There is no evidence of an instruction by the warden to not transfer Whitford back to MSP, nor any other guarantee. Defendants' purported security interests in Whitford's behavior is similarly suspect. Whitford's behavior has only improved over the many years of litigating this case, with Whitford going from a handful of rules violations in 2023, to two disciplinaries in 2024. 1-SER-002–013; Ex. A ¶ 24. Furthermore, though they assert that Whitford is a Pride member (which Whitford contests), their own request for a transfer confirms that prison officials "have not seen him active with the gang" and NJSP has not labeled him as a gang member. Mot. Exhibit A; Ex. A ¶ 26. Despite having Whitford in their custody for nearly a decade and stressing his disciplinary history throughout the years of litigating his case, Defendants have only made a request for transfer within days of being represented by counsel, and succeeded in transferring him at the conclusion of the appellate briefing. Like in *Doe*, the timing of the transfer, lack of deliberation, and dearth of evidence demonstrating that Whitford will not be transferred back suggests an intent to evade the district court's jurisdiction and a reasonable likelihood he will return to MSP upon disposing of his case.

11

Defendants cite a single case, *Dilly v. Gun*, to support their claim that Whitford's case is moot, but *Dilley* is distinguishable. Mot. 6 (citing 64 F.3d 1365, 1369 (9th Cir. 1995)). In *Dilley*, the plaintiff was categorically unable to be transferred back to the original prison because he was classified at a security level where the original prison could no longer accept him, meaning there was no meaningful expectation he could be transferred back. *Id.* The same is not true here— there is nothing barring Whitford's return according to his classification level and Defendants have not shown otherwise.

## II. Legal Rights Transferred with Whitford To New Jersey, Making this Case Not Moot.

Under the Interstate Correctional Compact (ICC), Montana retains jurisdiction and control over Whitford's continued treatment in New Jersey after Whitford was transferred. The ICC allows for states to transfer individuals out of state with "the receiving state to act in that regard solely as an agent for the sending state." Mont. Code § 46-19-401 (a). Under Montana's ICC statute, "[i]nmates confined in an institution pursuant to the terms of [the] compact shall at all times be subject to the jurisdiction of the sending state and may at any time be removed therefrom for transfer to a prison or other institution within the sending state." Mont. Code § 46-19-401 (c). The Compact provides clear language that a transferred individual may not be deprived "of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state." Mont. Code § 46-

12

19-401 (e). Furthermore, a transferred prisoner shall have any benefits she would have been accorded in prison in the sending state. Mont. Code § 46-19-401 (h).

The plain meaning of Montana's ICC statute provides for continued jurisdiction over Whitford and review for his continued treatment consistent with his previous rights, which makes his case live. This Court has allowed cases to proceed despite the transfer of incarcerated plaintiffs out of state particularly when they are subject to the ICC. In *LeMaire v. Maass*, the plaintiff brought an Eighth Amendment claim challenging conditions of disciplinary segregation in Oregon State Prison (OSP), where he was initially incarcerated. 12 F.3d 1444, 1447 (9th Cir. 1993). The plaintiff was granted an injunction regarding various policies that govern the conditions in OSP's disciplinary segregation. *Id.* at 1450. The plaintiff was serving a life sentence in Oregon's jurisdiction and remained there until oral argument, when he was transferred to Nevada via the ICC. *Id.* 1462. This Court held that the plaintiff's status, "however, does not moot this controversy. Because he remains under the control for the Oregon prison system, the practices and actions of which he complains are certainly capable of repetition. Moreover, the district court's injunction as the management of disruptive inmates in the DSU is ongoing." *Id.* at 1462 n.5 (citations omitted); *see also Barrett v. Belleque,* 475 F. App'x 653, 655 (9th Cir. 2012) (recognizing *LeMaire*'s holding regarding mootness in a situation where a prisoner is transferred via the ICC and where there is an ongoing injunction).

13

Similarly here, Whitford will always be under Montana's jurisdiction. Montana has control over Whitford's placement and treatment at all times. Like in *LeMaire*, Whitford was held in the Montana state prison system for the last decade and throughout the entire proceedings below, until he was transferred during the pendency of the proceedings on appeal. Also like in *LeMaire*, the district court granted Whitford's injunctive relief to allow Whitford and similarly situated Native religious practitioners to obtain personal pipes which is currently in effect, especially when the Defendants have now disposed of their appeal. Ans. Br. 3. n.1. Therefore, it would be appropriate to allow Whitford's case to proceed under Montana's jurisdiction.

Because the plain meaning of the ICC statute ensures the incarcerated person has all the benefits and legal rights conferred from the sending state, Montana's religious policies necessarily implicate his ongoing treatment. Whitford may not be deprived of any legal rights he would have received while in Montana, including the religious rights at issue in his ongoing litigation, and the relief he has already won regarding personal pipes. Because New Jersey simply acts as an agent for the jurisdiction and control of Montana under the ICC, the decision by this Court may provide directives for Whitford's treatment in New Jersey. *See Pryor v. Brennan*, 914 F.2d 921, 926 (7th Cir. 1990) (District of Columbia prisoners transferred to state facilities under ICC were entitled to accumulate good time credits in accordance

14

with District of Columbia rules); *Hayes v. Lockhart*, 754 F.2d 281, 283 (8th Cir. 1985) (Arkansas inmate transferred to Florida was entitled to good time and other benefits earned in Florida on the same basis as if he had earned them in Arkansas); *Wiglesworth v. Pagel*, 614 F. App'x 953, 959 (10th Cir. 2015) (holding that a prisoner's due process claim was not mooted by his transfer from a facility in Colorado to one in Alaska because expunging his disciplinaries could have collateral consequences that "will have some effect in the real world").[1]

### III. Relief is Still Available Because the Transfer to NJSP was a Continuation of the RLUIPA Violations by MSP Defendants

It would be particularly inappropriate to hold that Whitford's RLUIPA claims are moot when it is plausible that the transfer itself is yet another violation of RLUIPA. That is to say, the transfer is not the end of Defendants' religious discrimination against Whitford but instead a continuation of it. As such, this Court has the ability to provide relevant relief to Whitford by deciding the RLUIPA issues on appeal and allowing the district court to consider the additional RLUIPA violations in the Defendants' transfer of Whitford.

Under RLUIPA, substantial limitations on religious liberties may not be an additional punishment imposed on incarcerated people, and must be justified under

---

[1] State courts have held similarly. *See Barrett v. Peters*, 360 P.3d 638, 642 (Ore. App. 2015); *Hundley v. Hobbs*, 456 S.W.3d 755, 758 (Ark. 2015); *Boatwright v. Dir., Dep't of Prison*s, 849 P.2d 274, 276 (Nev. 1993).

a demanding strict scrutiny standard. *Ramirez v. Collier*, 595 U.S. 411, 433 (2022). There is no question Whitford's transfer substantially limited his religious practice— indeed, it has made any form of religious practice virtually impossible. Ex. A ¶ 19; *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 40 (D.D.C. 2002) (applying RLUIPA's sister statute, RFRA, to decisions to transfer prisoners to systems that would not accommodate their religious practices). Because his tribe is native to the lands in Montana and he has significant religious significance in the land itself, a transfer so far from his homelands is devastating to his religious beliefs. Ex. A ¶ 17. Transferring him 2,000 miles from home to a prison system without accommodations for Indigenous prisoners has had a far greater limitation on his religious practices than any of their past restrictions, including ones the district court concluded violated RLUIPA. *See Shilling v. Crawford*, 536 F. Supp. 2d 1227, 1232 (D. Nev. 2008), aff'd, 377 F. App'x 702 (9th Cir. 2010) (holding that forcing prisoners to choose between religious accommodation and transfer to a higher-security setting violated RLUIPA). Nor does it appear that their purported basis for the transfer of security reasons could satisfy strict scrutiny, as the description is conclusory and appears to be insincere, as described above. Because the court retains the authority to provide relief to Whitford as to both the RLUIPA violations that occurred in Montana and those that sent him from Montana, this case is not moot.

*Jackson v. District of Columbia* is instructive. 89 F. Supp. 2d 48, 55 (D.D.C. 2000). In *Jackson*, a class of prisoners who were originally convicted in the District of Columbia were sent to Virginia prisons under the ICC where they were subject to grooming policies that violated their religious beliefs. *Id.* at 50. The court held that the plaintiffs had standing to sue the District of Columbia defendants because "plaintiffs would not be subject to Virginia Correction's grooming policy but for defendant's decision to send them to Virginia" and "defendants cannot absolve themselves of their duties to District prisoners simply by contracting for the services of a third party." *Id.* at 52. Furthermore, the court held that because "defendants retain legal custody over plaintiffs and plaintiffs retain any rights they would have if held in defendant'' facilities, plaintiffs' suit is well grounded against defendants' agency challenge." *Id.* at 55.

Similarly, if not for Defendants' actions to send him to NJSP, Whitford would not be subject to the continuing—and worsening—RLUIPA violations occurring while he is transferred. Because Montana continues to have legal custody over Whitford and Montana officials have further burdened Whitford's religious rights by sending him to New Jersey, the issue is not only live but even more essential to consider. Like in *Jackson,* Defendants may not absolve themselves of religious rights violations by committing *more* religious rights violations and washing their hands with Whitford.

17

**IV.    Relief is Still Available as Evidence Exists that Whitford's Transfer Was Retaliatory, and the District Court May Provide Relief to Return Him Back to MSP.**

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Retaliatory actions taken by prison officials against incarcerated persons for exercising their First Amendment right to file grievances "violate the Constitution." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567 (footnote omitted). The facts here meet each of these requirements.

First, Defendants were state actors who took adverse action against Whitford by transferring him to a prison system across the country to be held in a more restrictive environment. Defendants knew how important Whitford's religious practices were and transferred him across the country, away from his homelands, and without any access to religious services whatsoever, which has affected his spiritual and mental health so much that it led Whitford to attempt to commit suicide.

18

Ex. A ¶ 22; Mot. Exhibit A. Defendants were also aware that Washington State Department of Corrections (WDOC) provides the religious services that Whitford has been requesting, as Whitford has extensively referred to WDOC in these proceedings, *e.g.* Op. Br. 15–16, but they instead placed him in a facility with even less religious access than he has now. Ex. A ¶ 23. This is more than sufficient to meet the standard for adverse action. *See Rhodes*, 408 F.3d at 568 (holding that merely threatening to transfer a prisoner constitutes adverse action).

Second, Whitford provides evidence that Defendants' actions were "because of" his protected conduct.[2] His initial complaint detailed a long history of retaliation for advocacy for religious rights. *See* 2-ER-78, 2-ER-152; 2-ER-186; 3-ER-469; 3-ER-500. The initial outreach to transfer him across the country was made four days after Whitford obtained counsel. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent"). The transportation officials who conducted the transfer found it to be unusual, asking Whitford why it was being conducted in such a harsh way. Ex. A ¶ 25. When he arrived in NJSP, prison officials told him that Montana officials based

---

[2] Though Whitford's evidence is circumstantial because his access to discoverable information is limited at this stage, this Court has noted that "direct evidence of retaliatory intent" is "rarely" available before discovery. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).

19

the transfer on his membership in a gang, but Whitford denies ever being in a gang and it has never been substantiated. Ex. A ¶ 26

Third, Whitford's filing of grievances and use of the courts to protect his rights are archetypical protected conduct. *Rhodes*, 408 F.3d at 568 (citing a string of this Court's precedent to show that the prisoner's claim was an "archetype" of a First Amendment claim when he alleged destruction of property and threats of transfer for filing grievances and accessing the legal process).

Fourth, Whitford has satisfied the chilling effect element. When a plaintiff has shown significantly more than de minimis harm, he need not separately allege any chilling effect. *Brodheim*, 584 F.3d at 1270; *Rhodes*, 408 F.3d at 568 n.11 ("Alleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety." (emphasis in original)). There is no clearer harm than Whitford's attempt to commit suicide by hanging himself as a result of Defendants' actions. Opp. Exhibit A ¶ 22. He was transferred across the country to a higher security classification and, more importantly, entirely separated from the religious practices for which he had fought so hard for and partially won. Furthermore, the record is riddled with evidence that Defendants have attempted to chill his access to the courts—from denying him due process, ECF 2 at 1–12, to refusing access to basic legal resources,, ECF 50, to transferring him as soon as he was represented,

Mot. Exhibit A—Whitford's transfer is just a continuation of Defendants' retaliatory and chilling conduct.

Finally, Whitford can plausibly allege that his transfer did not advance a legitimate penological purpose. The purported basis of the transfer was his disciplinary record but no disciplinary conduct appears to have actually spurred the transfer. Ex. A ¶ 24. Whitford's disciplinary history was steadily improving, not worsening at the time of request and eventual transfer. *Id.*; 1-SER-002–013. Furthermore, though they claim that Whitford is affiliated to a gang, they acknowledge they have not seen him active in the gang, Mot. Exhibit A, and NJSP also found insufficient information to classify him as a gang member. Opp. Exhibit A ¶ 27.

If the transfer itself constitutes a violation of the First Amendment, then the court retains the ability to effectuate relief, and this appeal is not moot. Following review by this Court, the district court may consider the issue of the retaliatory transfer to determine whether appropriate relief would be to return Whitford to ensure his First Amendment and RLUIPA rights are not violated. *See Rouse v. Benson*, 193 F.3d 936, 939–42 (8th Cir. 1999) (reversing a grant of summary judgment when a Native American plaintiff alleged he was transferred under the ICC in retaliation for his ongoing advocacy with Native American prisoners and sought a transfer back, holding, "a prisoner cannot be transferred in retaliation for his

21

exercise of constitutionally protected rights, either between prisons in a single state, or between state and federal prison systems under the Interstate Corrections Compact") (citations omitted). As such, there continues to be a live controversy below following the conclusion of this appeal.

## CONCLUSION

Appellant respectfully requests the Court to deny Appellee's motion to dismiss this appeal.

Date: 5/2/2025

/s/ Samuel Weiss
Amaris Montes
Samuel Weiss
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
202-455-4399
amaris@rightsbehindbars.org
*Attorneys for Plaintiff-Appellant*
*Makueeyapee Whitford*

## CERTIFICATE OF COMPLIANCE

This opposition contains 5,177 words, excluding the items exempted by Fed. R. App. 27(a)(2)(B). The brief's typeface and type -style comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Fed. R. App. P. 27 (d)(2)(A).

Date: 5/2/2025

/s/ Samuel Weiss
Samuel Weiss
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
202-455-4399
sam@rightsbehindbars.org
Attorney for Plaintiff-Appellant
Makueeyapee Whitford

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  May 2, 2025

/s/ Samuel Weiss

Amaris Montes
Rights Behind Bars
M St. NW Fnt. 1 #33821
Washington, DC 20033
202-455-4399
sam@rightsbehindbars.org
*Attorney for Plaintiff-Appellant*
*Makueeyapee Whitford*

# Exhibit A

## DECLARATION OF AMARIS MONTES

I, Amaris Montes, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a licensed attorney in good standing in Maryland.

2. I am enrolled as pro bono counsel for Makueeyapee Whitford in *Makueeyapee Whitford v. Jim Salmonsen, et al.*, No. 24-3177, 24-3340.

3. I represent the declarant on appeal in this case.

4. I spoke with Mr. Whitford on April 14, 2025 and April 17, 2025 for thirty minutes each day (as is the time limit for legal calls by New Jersey State Prison policy or practice) to obtain the information provided below regarding his transfer and treatment at New Jersey State Prison for purposes of a declaration.

5. Defendants filed their Motion to Dismiss in this matter on April 22, 2025.

6. After receiving Defendants' Motion to Dismiss, I sought a legal call on April 25, 2025 to discuss finalizing a declaration on behalf of Mr. Whitford to build a record on the circumstances of his transfer.

7. After receiving no response, I followed up on April 28, 2025. I was told that the only available time for a legal call was May 2, 2025, the day Plaintiff's Opposition for Motion to Dismiss was due. That same day, I emailed back confirming to take this May 2nd slot.

8. On May 2, 2025, I emailed to ensure the call was taking place. Kim Williams, the Secretarial Assistant, abruptly informed me that the call was not scheduled.

9. I repeatedly spoke to Ms. Williams to attempt to resolve the issue to ensure the call would occur given the urgency and importance of the matter. They did not allow me to speak to my client.

10. The information represents the information from our calls on April 14 and 17, 2025 to the best of my knowledge according to contemporaneous notes I recorded and is phrased in the manner that Mr. Whitford described them to me. Given the urgency of this matter, the incarceration of my client, and time constraints for this filing, we submit the following information to support Plaintiff's Opposition to Defendants' Motion to Dismiss.

11. We have contacted opposing counsel, Blake Koemans, on May 2, 2025 regarding these issues with legal calls. He has not opposed the filing of this Declaration in Support Plaintiff's Opposition to Defendants' Motion to Dismiss.

12. Upon contacting our client, we will file a supplemental declaration phrased in the first-person with Mr. Whitford's e-signature with his authorization.

---

13. Mr. Whitford is an enrolled member of the Blackfeet Nation.

14. Mr. Whitford is currently being held in the New Jersey State Prison. He arrived at the end of January 2025.

15. Prior to being transferred to New Jersey State Prison he was incarcerated in Montana State Prison.

16. Mr. Whitford practices Native religious practices according to his traditional ceremonial practices as a Blackfeet member. His religious practice is integral to his everyday life.

17. Mr. Whitford's tribe is located in Montana. The land itself is sacred to him. Both of the prisons in Montana are on Blackfeet ancestral land and he feels connected to this land. Montana State Prison is located in what they consider the Sweetgrass Hills which is important to the stories of his people. Deer Lodge, the city where Montana State Prison is located, is named after a spring and was a sacred site to pray. Shelby, Montana is in the Sand Hills where his people believe they go to die. The Hells Canyon area was a hunting location for his people and was a place to come together. These land markers are used to tell and recount stories. This connection to land is very important to him and to other tribal members because it is the root of the tribe's language, and language is where they come from, who they are, and the basis of the belief system of his people.

18. His family and loved ones— both inside and outside prison—are in Montana. He has many relatives incarcerated in Montana, along with other Blackfeet tribal members in Montana State Prison. They, as Blackfeet members, have their own Native American ways, and community gatherings which are important cornerstones of their religion.

19. Since being transferred to New Jersey State Prison, Mr. Whitford has no access to religious services at all. There is no sweat lodge there, which he needs to adhere to his spiritual practice. There are no group prayer services and even individual prayer is not possible because they do not allow them to have any smudging medicines such as sage or sweetgrass. When he arrived, prison officials confiscated many religious items including necessary medicines such as sweetgrass, ocean root, lavender and sage. They also confiscated his dream catcher and eagle feather.

20. He has been attempting to file grievances regarding the denial of religious practices, but prison officials do not allow him to. They are required to fill grievances over a kiosk, but the kiosk is broken. When he asked for paper grievances, prison officials state that they do not have sufficient paper. As a result, he has no means to file grievances regarding the denial to his religious rights.

3

21. Being transferred so far from his homelands and his people affects Mr. Whitford everyday. It has taken a psychological toll on him. He feels so isolated from his family, friends, and tribe because he cannot have any communication with his people. Because he cannot practice his religion in New Jersey, he has no connection whatsoever to his traditional ways or spiritual medicine. He got sick from shock after being transferred.

22. On or around March 19, 2025, soon after he was transferred to New Jersey State Prison, Mr. Whitford attempted to take his own life by hanging himself. He felt so helpless and disconnected from his people, traditions, and his land when he was transferred that he felt like there was no other choice.

23. He was alerted of the possibility of transfer at the end of November 2024. At that time, he was very concerned about his transfer and asked the officers why they were going to transfer him. He requested not to be transferred. He wrote them a letter requesting more information but none of the officers would give him more information about the reason for his transfer. He also requested that if he was going to be forced to be transferred that he could be placed in Washington State Department of Corrections because he knew they have religious access to proper Native religious ceremonial practices. He also has family members there including his children in the Yakima Indian Reservation. He never received a response to his inquiries for more information.

24. He was confused about why he was being transferred because his behavior has improved over recent years. To the best of his knowledge, in 2025, he had not received any disciplinaries, other than his attempt at suicide. In all of 2024, he only received two disciplinaries arising from the same issue on March 28, 2024. He had no disciplinaries immediately around his time of transfer and his behavior had gradually improved over time, so he didn't understand why they were punishing him.

25. The process of his transfer was strange and unlike any transfer he has ever experienced. The day of his transfer they took him out to an unmarked car. He heard the prison officers tell the transportation officers that they were

instructed to go straight through the entire way without taking breaks or stopping in jails. While he was being transferred, the transportation officers, who were employed by a separate company, asked him why he was being transferred. He told them he did not know. They told him the transportation process was not usual because they do not usually receive a request to go straight through with no rest or stops, and that they usually do make stops. He was driven directly from Montana to New Jersey for over 36 hours.

26. When he got to New Jersey, a sergeant told him that Montana State Prison told New Jersey that he was being transferred because he was in a Security Threat Group (STG), or in other words, a gang. They told New Jersey Prison that he was part of Pride, a Native American gang, and said he was a "ring leader." He stated he has never been a gang member and has never been in the Pride gang. While Pride members go to ceremonies like pipe circle or sweat lodge, they attend just like any Native person and are not a threat to their religious practice during the ceremony. He believes Montana State Prison said so only because he is Native and they all attend ceremonies together. He believed they wanted to transfer him because of his case.

27. New Jersey State Prison officials had an STG hearing with him and concluded he is not in a gang and was not in the Pride gang. They told him that they had no information corroborating that he was in a gang, so they did not classify him as such.

28. Since he has been in New Jersey he has been placed in administrative segregation where he is locked in his cell for 20 hours a day. Review only happens every 90 days. Men are always yelling and there are rats everywhere in his cell—he states that it is torture for him. He was placed in the highest security level in New Jersey, even though, to the best of his knowledge, he had sufficient good behavior to be in the general population level.

29. Mr. Whitford believes that he was transferred because of his ongoing religious rights case.

I declare under penalty and perjury that the statements above are true and correct to the best of my knowledge and that this declaration was executed on May 2, 2025 in New York, New York.

_____
Amaris Montes
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
*Attorney for Appellant Makueeyapee Whitford*

# Exhibit B

## DECLARATION OF AMARIS MONTES

I, Amaris Montes, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a licensed attorney in good standing in Maryland.

2. I am enrolled as pro bono counsel for Makueeyapee Whitford in *Makueeyapee Whitford v. Jim Salmonsen, et al.*, No. 24-3177, 24-3340.

3. I represent the declarant on appeal in this case.

4. On May 2, 2025, I visited the New Jersey Department of Corrections "Offender Search" site, at https://www.doc.state.nj.us/DOC_Inmate/inmatesearch. I typed in "Makueeyapee" for the search box for "First Name" and "Whitford" for the search box for "Last Name," and clicked "Submit." The website took me to a new page that stated, "Your search did not produce any results."

5. Next, I searched by the "SBI Number" which corresponds to an inmate number. New Jersey officials have included the following SBI number in emails regarding legal calls with Mr. Whitford: OS01958914. I used this number to search in the same "Offender Search" engine. The same window appeared, stating, "Your search did not produce results."

6. Next, I included all of the above information, including both Mr. Whitford's first and last name, as well as SBI number. The same window appeared, stating "Your search did not produce results."

7. Next, I searched by race, "Am. Indian or Alaskan Native," and by facility, "New Jersey State Prison." Two individuals appeared in the results, none of whom had the name or SBI number as Mr. Whitford.

I declare under penalty and perjury that the statements above are true and correct to the best of my knowledge and that this declaration was executed on May 2, 2025 in New York, New York.

Date: May 2, 2025

Amaris Montes
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, DC 20033
*Attorney for Appellant Makueeyapee Whitford*